## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| JUSTIN POTTER, Derivatively on Behalf of DOLLAR GENERAL CORPORATION. | Case No: |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| TODD J. VASOS, JEFFREY C. OWEN, JOHN W. GARRATT, KELLY M. DILTS, MICHAEL M. CALBERT, PATRICIA FILI-KRUSHEL, WARREN F. BRYANT, ANA M. CHADWICK, TIMOTHY I. MCGUIRE, DEBRA A. SANDLER, RALPH E. SANTANA, and WILLIAM C. RHODES, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and, | |
| DOLLAR GENERAL CORPORATION, | |
| Nominal Defendant. | |

Plaintiff Justin Potter ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Dollar General Corporation ("Dollar General" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of law that have caused substantial harm to the Company.

## JURISDICTION

2.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R.§240.10b-5, promulgated thereunder by the SEC.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise

purposefully availed themselves of this District through being listed on the stock exchange in this District and issuing false statements in this District.

5.     In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6.     Plaintiff is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7.     *Nominal Defendant Dollar General* is incorporated under the laws of Tennessee with its principal executive offices located in Goodlettsville, Tennessee. Dollar General's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DG."

### Director Defendants

8.     *Defendant Todd Vasos* ("Vasos") has served as the Company's Chief Executive Officer ("CEO") since October 2023 and as a member of the Board of Directors (the "Board") since June 2015.  Defendant Vasos previously served as CEO from June 2015 to November 2022 when he transitioned to Senior Advisor prior to retiring in April 2023.

9.     *Defendant Michael Calbert* ("Calbert") has served as a member of the Board since 2007 and has served as Chairman of the Board since January 2016.

3

10.     ***Defendant Warren Bryant*** ("Bryant") has served as a member of the Board since 2009. Defendant Bryant also serves as a member of the Board's Audit Committee and Human Capital Management Committee.

11.     ***Defendant Ana Chadwick*** ("Chadwick") has served as a member of the Board since July 30, 2022. Defendant Chadwick also serves as Chairperson of the Board's Audit Committee.

12.     ***Defendant Patricia Fili-Krushel*** ("Fili-Krushel") has served as a member of the Board since 2012. Defendant Fili-Krushel also serves as Chairperson of the Board's Human Capital Management Committee and as a member of the Nominating, Governance and Corporate Responsibility Committee.

13.     ***Defendant Timothy McGuire*** ("McGuire") has served as a member of the Board since 2018. Defendant McGuire also serves as a member of the Board's Human Capital Management Committee.

14.     ***Defendant David Rowland*** ("Rowland") has served as a member of the Board since August 5, 2023.  Defendant Rowland also serves as a member of the Board's Audit Committee.

15.     ***Defendant Debra Sandler*** ("Sandler") has served as a member of the Board since April 1, 2020. Defendant Sandler also serves as Chairperson of the Board's Nominating, Governance and Corporate Responsibility Committee and as a member of the Audit Committee.

16.     ***Defendant Ralph Santana*** ("Santana") has served as a member of the Board since 2018.  Defendant Santana also serves as a member of the Board's Nominating, Governance and Corporate Responsibility Committee.

4

17.    **Defendant William Rhodes, III** ("Rhodes") served as a member of the Board from 2009 until May 2023.  During the Relevant Period, Rhodes also served as Chairman of the Audit Committee.

18.    **Defendant Jeffrey C. Owen** ("Owen") served as the CEO of Dollar General and a member of the Board from November 2022 until the reappointment of Defendant Vasos in October 2023. Defendant Owen previously served as the Company's Chief Operating Officer ("COO") from August 2019 to November 2022.  Defendant Owen is named as a defendant in the Securities Class Action (defined below).

19.    The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

20.    **Defendant Kelly M. Dilts** ("Dilts") has served as the Company's Chief Financial Officer ("CFO") since May 2023. Defendant Dilts previously served as Senior Vice President, Finance, having joined Dollar General in July 2019. In connection with her promotion to CFO, the Board's Compensation Committee approved Defendant Dilt's annual base salary to $750,000, an increase in targeted annual incentive opportunity from 50% to 75% of her base salary, and a one-time long-term incentive having an approximate value of $878,297 delivered in non-qualified stock options. Defendant Dilts is named as a defendant in the Securities Class Action.

21.    **Defendant John W. Garratt** ("Garratt") served as the Company's CFO between September 2022 and April 2023 and as its President between September 2022 and June 2023. Defendant Garratt also served as the Company's interim CFO between July 2015 and December 2015. Defendant Garratt is named as a defendant in the Securities Class Action.

5

22.     Defendants Dilts and Garratt along with Defendants Vasos and Owen are collectively referred to herein as the "Officer Defendants."

23.     The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## BACKGROUND

24.     Dollar General is the largest discount retailer in the United States by number of stores, with over 19,000 stores located in the U.S. and Mexico.  The Company offers a selection of merchandise, including consumable items, seasonal items, home products and apparel, typically at prices of $10 or less.

25.     Dollar General purports to maintain competitive prices in part due to its low-cost operating structure, a relatively limited assortment of products offered, and a low average cost of product cost driven by large purchasing volumes.

26.     The Company's retail footprint focuses on thinly populated areas.  As of March 2023, over 80% of Dollar General stores were located in towns of 20,000 or fewer people.  Dollar General has rapidly increased its store footprint over the past decade, growing from around 10,000 stores in 2012 to more than 19,000 stores by 2022.

## THE MISCONDUCT

### Dollar General Lacked Basic Inventory Controls

27.     Given its critical importance to the success of Dollar General's business model, the Individual Defendants repeatedly touted the efficacy, strength and quality of Dollar General's inventory controls and management practices, which they used to help paint the overall picture of a stable and growing company. For example, the Individual Defendants told investors that "efficient inventory management is a key component of our business success and profitability"

and that it was a specific "area of focus for us." They also assured investors that they were watching carefully to balance the maintenance of "sufficient inventory levels" with their concern about "allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage." Market participants such as securities analysts that followed Dollar General stock regularly asked about inventory. The Individual Defendants reassured them that everything was under control, stating for example that the Individual Defendants were "pleased with our overall inventory levels."

28.     The Individual Defendants' statements touting their inventory management practices and the quality of Dollar General's inventory helped them portray the Company as financially healthy and delivering on the growth promised to investors. Indeed, before the truth was revealed, the Individual Defendants touted Dollar General's purportedly decreasing inventory shrink quarter-after-quarter. The Individual Defendants also boasted that they "were well ahead of any inventory issues . . . unlike some of our competitors out there" and that they were able to "driv[e] sustainable long-term growth"—even during the COVID-19 pandemic. As such, investors flocked to Dollar General and the Company's stock price soared, skyrocketing from $184.11 to a high of $260.44.

29.     Contrary to the Individual Defendants' public statements, numerous former Dollar General employees reported that the Company was plagued by massive amounts of excess inventory and lacked basic inventory controls. These former employees also recounted facts establishing the Individual Defendants' knowledge of the inventory control deficiencies, or at minimum, the Individual Defendants' reckless disregard of those problems. These accounts were provided independently by multiple individuals who had direct experience working at Dollar

General in different roles, at different times, and from an array of different geographical locations—but their reports are strikingly consistent and, thus, corroborating.

30.     Former employee #1 ("FE-1")[1] was a Store Manager in Dollar General's Dracut, Massachusetts store from 2012 to February 2022. FE-1 witnessed first-hand Dollar General's inventory management problems, including for example, unnecessary items being excessively shipped to her store.  Indeed, FE-1 recalled sending messages to Dollar General warehouses stating: "For the love of God, please stop sending this"—but excess product would still arrive the next week.  FE-1 stated that Dollar General's buyers, who were responsible for ordering inventory from suppliers, would over-order merchandise and, since there was no room in the distribution center warehouses, the Company would force-send the product to stores. Thus, the excess inventory would pile up at the store level.

31.     FE-1 stated that, toward the end of her last week at the Company in February 2022, she emailed Defendant Vasos to explain what it was like working at a Dollar General store. In particular, FE-1 said that her email to Defendant Vasos specifically explained that Dollar General stores were being bombarded with inventory, among other issues such as hiring and basic maintenance. FE-1 described her email to Defendant Vasos as well-written, "good and long," and she said it covered the issues thoroughly as well as providing suggestions on how to fix the problems at Dollar General stores. FE-1 recounted that, in response to her email, Defendant Vasos's personal secretary called her. According to FE-1, the tone of her call with Defendant Vasos's secretary was not one of caring about FE-1's concerns, but instead to ask whether FE-1

---

[1]     References to Former Employees are taken from the Securities Class Action (defined herein) and are based upon information and belief.

intended to go to the media. FE-1 said that Defendant Vasos's secretary asked if FE-1 had voiced her concerns to anyone else and whether she would be speaking to the media.

32.    Former employee #2 ("FE-2") was an Assistant Store Manager and Store Manager at a Dollar General in North Carolina for multiple years. As a store manager, FE-2's responsibilities included managing stocking product, registers, customer service, employee scheduling, monitoring payroll budget, and receiving trucks.  FE-2 said that about 70% of her time was spent stocking shelves.

33.    FE-2 explained that her Dollar General store received excess inventory due to the Company's automated order system, which would send inventory regardless of the store's need. Indeed, FE-2 said that her store would get bombarded with product it did not need. She gave an example where, even though her store did not need hand sanitizer and already had dozens of bottles in stock (96 to be exact), multiple excess boxes of hand sanitizer would still arrive. FE-2 reported that, at Dollar General, store managers were not allowed to stop trucks from delivering product. Thus, for example, FE-2 said that a store in her area was shut down by a fire marshal for being dangerous—but the trucks full of inventory kept arriving regardless. When this store was shut down, FE-2 recounted, Dollar General's Division Vice President Amanda Cauthier visited the store and saw the excess merchandise but still did not offer to stop the truck deliveries. Likewise, FE-2 explained, even if a store's freezers or coolers were down—there was still no way to stop a delivery, and so spoiled inventory had to be thrown away.

34.    FE-2 stated that senior leadership at Dollar General "absolutely" knew about the inventory management problems that plagued the Company.  FE-2 said she knew this because she personally sent two emails advising Company officials of a list of issues at Dollar General, including the inventory problems. First, in one email, which she sent anonymously to top corporate

executives, including Defendants Vasos and Owen during the first week of July 2021, FE-2 said she advised the Company about the inventory problems she saw and what the Company needed to fix in terms of staffing, truck delivery problems, and inventory management issues.

35.     Second, FE-2 reported sending another email, which she sent in her name (*i.e.*, not anonymously) when she quit working at Dollar General (in June 2022), to "everyone in the top three tiers of the Company," including Defendants Vasos, Owen, and Garratt.  According to FE-2, her second email provided the Individual Defendants and the other Dollar General officials with a long list of problems that she saw while working at Dollar General, including the trucking and inventory problems.  In response to this email, FE-2 recounted that Sanja Krajnovic, a Senior V.P. at Dollar General, called FE-2 back on her personal cell phone. FE-2 said that, on this phone call, she specifically spoke to Krajnovic about the inventory management problems, staffing shortages, and the inability of stores to stop trucks from delivering excess merchandise.

36.     Former employee #3 ("FE-3") was the Director of Distribution Center Maintenance for Dollar General's distribution centers and warehouses east of the Mississippi River from October 2022 through June 2023, which included 17 warehouses located in Georgia, Florida, and Alabama. FE-3 reported to Ed Collins, Senior Director of Maintenance who, in turn, reported to James Thursby, Vice President, Distribution Operations. FE-3 said that Mr. Thursby reported to Senior Vice Presidents Rod West and Andy Newkirk, who, in turn, reported to Antonio "Tony" Zuazo, Executive V.P. Global Supply Chain, and the Officer Defendants. FE-3's responsibilities included "everything . . . encompassed in buildings", including the overall upkeep of Dollar General's distribution centers in FE-3's territory, equipment ranging from conveyors to forklifts to cold building freezers, and training for maintenance employees.

37.     FE-3 stated that Dollar General had "reckless disregard" for proper inventory practices and confirmed that the Company suffered from an excess inventory problem. According to FE-3, this problem was caused by extreme overbuying by Dollar General's buyers without regard to demand—and the Company's failure to have proper checks on the buyers. FE-3 stated that, when she joined Dollar General in October 2022, she began hearing from her boss (Mr. Collins) about a push to get excess Dollar General merchandise from trailers into off-site locations by the end of the fiscal year 2022. FE-3 stated that within the January to March 2023 window, Company leadership set an aggressive timeline to get excess inventory sitting in trailers into offsite facilities. According to FE-3, this push occurred at the Stockbridge, Georgia warehouse as well other locations around the country.

38.     FE-3 recounted that the Company held a senior leadership call in February or March 2023, during which Senior V.P. Rod West estimated that there were 31 football fields worth of trailers sitting on parking lots with unloaded inventory and incurring detention fees (*i.e.*, penalties incurred for not returning a shipping container to the transport provider on time), which was costing the Company $19 million a month.  FE-3 stated that Mr. Zuazo attended this call, as did other senior Dollar General executives who reported to the Company's C-suite. FE-3 emphasized that it was a "big red flag" and "very unusual" for the Company to have 31 football fields of trucks and 10,000 trailers on its lots. FE-3 stated that Dollar General had "no check and balance on it [*i.e.*, inventory], just buying." As such, FE-3 believed that senior leadership at the Company "absolutely" knew about the inventory management issues. She further described Dollar General's push to get excess inventory from the trailers into these off-site locations as a "shell game" played by the Company.

39.     FE-3 said that the excess inventory being unloaded into the off-site facilities was not getting entered into Dollar General's inventory systems, including for example the Company's Warehouse Management System (WMS). This was because, as FE-3 explained, the inventory stored in these warehouses was not being scanned or properly received given that Dollar General only had WMS in its distribution centers—but not in its off-site warehouses. According to FE-3, it was because Dollar General could not track the inventory put into these off-site facilities—where it was shoved with "no rhyme or reason"—that the Company continued over-ordering inventory. FE-3 provided an example from the Stockbridge, Georgia distribution center, where the excess inventory caused the piling up of pallets (*i.e.*, portable rigid platforms used to carry goods via a forklift)—stacked five high and 10 pallets deep. FE-3 said that these towering stacks of pallets made it impossible to identify the inventory or enter it into the system properly—and they became a safety hazard.  According to FE-3, Company leadership also knew that inventory delivered to the off-site facilities was not being entered and processed into the WMS. FE-3 added that the Company "understood it was going to be financially impacted, so it was trying to sweep the problem under the rug and hide the fact that its inventory looked this way."

40.     Former employee #4 ("FE-4") was a Director of Allocation from February 2019 to February 2021, was promoted to Senior Director of Demand Chain in February 2021 and left the Company in April 2021. FE-4 worked at Dollar General's Nashville, Tennessee corporate headquarters and reported to Jessica Scaggs, Vice President, Inventory and Demand Management, who reported to Mr. Zuazo, who was then Dollar General's Senior V.P. Transportation and Inventory and VP Inventory, Demand Management and Supply Chain Services. During FE-4's tenure, Mr. Zuazo reported to Michael J. Kindy, Executive Vice President, Global Supply Chain who in turn reported to Defendant Vasos. In April 2021, Mr. Zuazo became Executive Vice

President, Global Supply Chain, reporting directly to the C-Suite, including the Officer Defendants. FE-4 was responsible for inventory management of inbound and outbound inventory support for all stores.

41.     FE-4 confirmed that there was an excess inventory problem at Dollar General. FE-4 described the situation at Dollar General as a "house of cards" that would "crumble" because the Company would not stop buying product, but also would not build the resources needed to handle it properly. According to FE-4, the Company filled its distribution centers, jam-packed its stores, and then was forced to mark down the inventory at fire sale prices.

42.     According to FE-4, Dollar General leadership had to pick and choose what items to send to the stores and, although the stores could not fit more product, the Company just continued to buy more inventory. FE-4 further explained that, during peak times in the fall and spring, Dollar General did not even have sufficient equipment — i.e., rolltainers or trucks—to deliver product to Dollar General stores.  FE-4 recounted that, every Sunday, there was a Company call at 1:00 p.m. where approximately 50 Dollar General officials would determine how many rolltainers, trucks and drivers were available and what product would be left out of deliveries that week—and that this information would be reported to Mr. Zuazo and other senior executives. FE-4 called this a "dumbfounding" way to run a supply business when the Company should have addressed the root cause by purchasing less inventory and getting more trailers, distribution centers, and rolltainers to handle the inventory it had to distribute to stores. FE-4 stated that, during peak season, attendees on these Sunday calls knew that one-fifth of the inventory could not go out each week.

43.     Given this information, according to FE-4, Mr. Zuazo "absolutely knew" about the backlogged inventory and the reasons for it. FE-4 further explained that Defendant Owen (then

COO and later CEO) also was informed of the inventory issues because the decisions being made on the above-discussed Sunday calls affected store operations, which Defendant Owen oversaw as COO. FE-4 also believed that it was likely that Defendant Vasos also knew about the inventory issues and their impact.

44.     FE-4 elaborated that the Sunday debates on what to ship often resulted in the seasonal items not getting timely sent out and "fall[ing] to the wayside" in delivery. For seasonal inventory, the consequence of missing one week of a holiday season meant that the window for selling that product was reduced. As FE-4 explained, if the holiday sales window was reduced from six weeks to five weeks due to delays, it increased markdown risk as the Company was missing up to 20% of the selling opportunity. FE-4 reported that often seasonal product did not make it to Dollar General stores' sales floors until three months after it was supposed to be sold, which caused it to become obsolete. Frequently, the Company could not even turn a profit on it. As FE-4 explained, this happened repeatedly and for multiple holidays the Company shipped holiday merchandise with delays.

45.     Former employee #5 ("FE-5") was a Director of International Logistics in the Company's Supply Chain Organization from April 2022 through September 2022. FE-5 reported to Sanjay Mishra, Vice President of Transportation, who reported to Mr. Zuazo (who was then the Company's Executive V.P., Global Supply Chain). FE-5 was responsible for working with shipping companies, such as steamship lines or trucking companies, with respect to bringing inventory into the United States and distributing it through a network of ports and partners to Dollar General's distribution centers. FE-5's primary responsibilities included dealing with the fees that Dollar General owed to the shipping companies for demurrage and detention fees, *i.e.*,

the penalties that would be charged when Dollar General failed to unload inventory within an agreed time period.

46.     FE-5 stated that Dollar General's elevated inventory levels were caused by continuous over-ordering of product by the Company's buyers without knowledge of the on-hand inventory or product in transit (international and domestic). FE-5 said that because Dollar General's distribution centers failed to log on-hand inventory in the Company's WMS inventory management system, Dollar General's buyers would place orders for new inventory not knowing existing product was already in the distribution centers.

47.     FE-5 also said that Defendant Owen, as CEO, over-focused on stocking inventory, which resulted in the over-ordering of inventory. FE-5 said that working at Dollar General was "like having tickets on the Titanic after it hit the iceberg – once you're on board, you're like 'why all this water?' And it begins to go down."

48.     FE-5 elaborated that the Company's distribution centers were being sent 40-50 containers of inventory per day but unloading only 10-20, which meant that they could never catch up. FE-5 stated that this posed a particular problem for seasonal items, which she said "always missed the mark that was set" to unload them in time to reach stores—and caused the Company to "miss the season" for such seasonal inventory.

49.     Indeed, FE-5 stated that Dollar General's distribution centers would take months to unload inventory — explaining that a product might arrive in February but would not get unloaded until June.  Thus, according to FE-5, the shipping companies would get angry with Dollar General because they needed their containers and chassis (*i.e.*, the trailers used to carry shipping containers) to be returned.  She recounted that every quarter Dollar General was trying to negotiate with each shipping company over $5 million to $7 million in detention fees that were caused by the

15

Company's buyers over-ordering. Thus, according to FE-5, Dollar General would for example owe $50 to $60 million in detention and demurrage fees in total in a single quarter (not including ocean transportation fees) to various shipping companies. FE-5 said that the Company kept kicking the can down the road and then tried to get the shipping companies to reduce the fees and renegotiate the contracts—but that would not fix the issues, so the problems would arise again the next quarter. FE-5 stated that she had never seen a more "toxic" relationship than the relationship between Dollar General and the shipping companies.

50.     FE-5 specifically raised her concerns and these issues to Dollar General's upper management on multiple occasions, including to Mr. Zuazo (who reported to the executives) in September 2022. FE-5 said she provided specific facts and information showing the Company's failures to timely unload and move inventory were exposing the Company to mounting fees and costs. According to FE-5, Mr. Zuazo was never motivated to fix these problems and was dismissive of FE-5's information. FE-5 also said that, after Mr. Zuazo was fired, the Company told FE-5's direct superior, Mr. Mishra, that he had a certain amount of time to fix inventory management problems. However, according to FE-5, they were never fixed.

51.     Former employee #6 ("FE-6") was a Director of Operations in the Atlanta metro area distribution center from May 2022 through May 2023. FE-6 reported to Chris McKinley, Vice President of Operations at Dollar General. FE-6 stated that Dollar General's significant increase in inventory was due to over-ordering at the Company, its failure to correctly receive and account for inventory, and its lack of understanding of what product the Company had in its excess or off-site warehouses. FE-6 recounted that Dollar General purchased "quite a bit" of outside storage in its excess warehouses. According to FE-6, Dollar General needed to purchase the extra warehouse space due to the excess inventory sitting in trailers in Company distribution center

parking lots. FE-6 said that the Company paid detention costs to trucking companies if trucks were not returned within 48 hours of unloading. FE-6 reported that there was a major Company-wide push to solve the detention fee issue by getting the merchandise into the warehouses, and off the trucks, by the end of January 2023.

52. However, according to FE-6, when Dollar General received product into these excess warehouses, it failed to enter that inventory into the WMS. FE-6 stated that entry into the WMS was the only way to create visibility into what inventory the Company had in store. FE-6 reported that Dollar General's off-site facilities did not even have Wi-Fi, making it impossible to use the WMS. As such, the Company's system and buyers did not know that the inventory existed. She stated, "they unloaded it but didn't count it." FE-6 elaborated that, because there was no room for the inventory and because it was not being booked as received in the inventory system, Dollar General's buyers kept buying and merchandise kept stacking up outside Company distribution centers. Thus, FE-6 stated, the merchandise unloaded into the warehouses was not accounted for, which created a "big overload of excess inventory" and a "vicious circle."

53. FE-6 further reported that the Company had excess amounts of obsolete merchandise. She explained that there were Dollar General warehouses full of inventory, filled to the roof with product, but there was no order fulfillment coming from those warehouses. FE-6 labeled it a "big mess" and stated that no cycle counts were done at these excess warehouses, as the Company simply did not know what was in them. FE-6 confirmed that this was "absolutely" a nationwide issue for Dollar General. FE-6 recalled that there was a major push by Vice Presidents of Operations around the country to get all the excess inventory off the trucks and into excess warehouses by the end of January 2023. Then, according to FE-6, "everyone started dumping product, not receiving it in inventory."

54. FE-6 said she told Mr. McKinley about these inventory management issues. FE-6 and Mr. McKinley also did walkthroughs of the Stockbridge off-site warehouse together and Mr. McKinley saw that it was a mess. FE-6 said that Mr. McKinley and other higher-ups were the ones that secured the off-site buildings and figured out the logistics of getting the trailers to the warehouses and unloaded.

55. Former employee #7 ("FE-7") was a Senior Demand Chain Analyst from 2021 through 2023. FE-7's responsibilities included working on the finance side of Dollar General's demand chain and then in inbound transportation (in a non-financial capacity). FE-7 stated that a problem with the Company's inventory system was that it would "lose visibility of inventory" when it sat in the distribution center yards. According to FE-7, this lack of visibility and the issues it caused were of great frustration to the demand chain group. FE-7 said that her understanding was that Mr. Zuazo was fired because he could not figure out how to relieve these inventory management issues in the distribution centers. According to FE-7, the Company was not hitting performance markers, nothing was changing, and Mr. Zuazo tried to blame the COVID-19 pandemic for everything.

56. FE-7 reported that Dollar General held regular Town Hall meetings involving Company leadership, including Vice Presidents and Senior Directors. According to FE-7, the inventory problems at Dollar General's distribution centers and the need to get them cleaned up were constant topics of discussion at the Town Hall meetings during FE-7's tenure at the Company (*i.e.*, from 2021 through 2023). FE-7 said it was the same story every quarter, and it did not matter what department you were in, you knew they [*i.e.*, the distribution centers] were terrible. FE-7 also recounted that these Vice Presidents and Senior Directors would always explain that directives regarding the distribution centers were "coming from the top." FE-7 further recalled that, while

these Company officials continued to discuss the distribution issues at Town Hall meetings, they stopped taking questions about them in February or March of 2023, which is when the Company was presenting its projections for the fourth quarter 2022 results. FE-7 said that Dollar General executives spoke about how constrained the distribution centers were and the fact that inventory was sitting on lots. Referring to Dollar General executives, FE-7 added "they were fully aware."

57.     Former employee #8 ("FE-8") was a Regional Director of Store Operations at Dollar General in the Kansas City, Missouri area from August 2021 to July 2023. In her position, FE-8 had 10 District Managers who reported to her, and her job responsibility was to develop the District Managers and visit stores in the region to identify any problems and provide support. Previously, FE-8 had served at Dollar General as a Regional Asset Protection Manager from November 2019 to August 2021, and before that she was a District Manager from February 2018 through October 2019.

58.     FE-8 stated that elevated inventory levels at Dollar General were a "real challenge." During her tenure at Dollar General, FE-8 stated that she believed that inventory levels rose more than 20% in the Kansas City, Missouri region. She also reported that a large majority of the stores in that region had excess inventory. FE-8 explained that deficiencies with Dollar General's inventory management process included that the Company was "blindly sending" inventory to stores. She said that, instead of using sales data specific to each store, Dollar General would automatically send a blanket order of product to stores regardless of what a store was selling. For example, the same amount of product was sent to stores selling $1 million as ones selling $3 million. According to FE-8, the "bottom line" was that the Dollar General stores did not have the holding power for the excess inventory being sent to them. The increased inventory was coming into stores but there was nowhere to put it — and yet the Company would still send more

merchandise. FE-8 further explained that Dollar General stores did not have a process for sending back overallocated merchandise — they had to "sit on it and deal with it."

59.     Former employee #9 ("FE-9") was a Senior Level Director within the supply chain organization at Dollar General for a year. FE-9 stated that she reported to senior leaders at the Company, who in turn reported to the executives.  FE-9 reported being privy to a significant amount of inventory management challenges, which she said resulted from "lax systems" at the Company. FE-9 explained that the Company's international import team was inundated with orders getting placed, which were overloading the Company's distribution centers. FE-9 described this as "a major issue and concern" during her tenure at the Company. She stated that, at Dollar General (unlike other retailers such as Walmart), finance played a role in supply chain decisions and was involved in the "gluttonous buying of product from overseas." FE-9 further stated that Mr. Zuazo knew about initiatives put in place to deal with inventory issues at Dollar General.

60.     As FE-9 explained, the Company was forced to get additional storage space to deal with the incoming volume of excess inventory, which was exceeding the capacity of its distribution centers. According to FE-9, the Company "absolutely" had excess amounts of obsolete merchandise, and it was stored in the distribution centers' off-site auxiliary buildings and in containers on the distribution centers' yards. FE-9 explained that, even though there was a significant amount of overage in the distribution center network, Dollar General "continued to order at a substantial pace," which exacerbated the issue. FE-9 stated that it was a matter of basic visibility and the Company's system for viewing inventory levels did not "let you see what you ha[d]." For example, FE-9 stated that Dollar General's system would show that the distribution center was 95% full, but not what specific items of inventory it was filled with—and it lacked detail about the items, their department, margins, or if the product was something that stores

actually needed to order. FE-9 stated, "in some ways, it's a free for all"—with the distribution centers pushing inventory out and the stores getting "stuff they didn't order, want, or need." According to FE-9, this happened because the inventory at Company distribution centers was so high, and it was all part of a lack of process at Dollar General.

61.     FE-9 explained that seasonal items further complicated the Company's inventory management problems. According to FE-9, Dollar General lacked controls to get seasonal items to the stores on time. Thus, the wrong mix of merchandise ended up at the distribution centers because there was not a proper mechanism for true visibility into whether the product ordered was selling, what was already in the distribution centers, and what was still in the supply chain. On top of this, FE-9 stated that the product just kept coming to the distribution centers regardless.

62.     Former employee #10 ("FE-10") worked as a Dollar General District Manager for 17 stores in Missouri from October 2020 through April 2022. FE-10 reported to a Regional Director who reported to a Division Vice President. FE-10 stated that, during her tenure as a District Manager, inventory issues and labor shortages were consistent problems at Dollar General. FE-10 attributed the elevated inventory issue at Dollar General to its practice of automatically shipping products regardless of need, as well as the lack of hours provided to in-store teams to perform product pushouts, which resulted in disorganized stockpiles of inventory that spilled onto sales floors. FE-10 explained that Dollar General had an automatic and perpetual inventory system, and the stores lacked the staff and ability to make corrections to the system. According to FE-10, this caused inventory counts to be off, and the system continued to send more unneeded inventory to the stores. FE-10 stated that, based on a seven-day workforce structure, it was impossible for store employees to put away the amount of merchandise required. FE-10 emphasized that: "Fixing inventory issues based on what distribution sent out was not possible." FE-10 explained that this

resulted in "impacted" store backrooms.  According to FE-10, items were not cycled on a first in, first out basis, and this caused product to expire as well as fire code issues.

63.      Former employee #11 ("FE-11") worked at Dollar General as a Regional Asset Protection Manager in Ohio from August 2021 through October 2022. FE-11's territory included 246 stores in Northern and Central Ohio (excluding Columbus) and in Western Pennsylvania. FE-11 reported to Division Asset Protection Manager, Kim Anderson, who in turn reported to Ken Peschier, who reported to the Senior Executive Counsel for the finance department. FE-11's job responsibility was to monitor inventory levels and report on how much the Company lost due to inventory issues. This was predominantly monitoring inventory loss, but also included cash loss and theft investigations.

64.      FE-11 stated that the Company's excess inventory problems presented constant issues for those tasked with asset protection management. According to FE-11, the factors contributing to Dollar General's inventory problems included inadequate training and staffing of store employees, high rates of turnover in store management, and the lack of effective processes for stores to turn away excess inventory delivered from the distribution centers. As she added, it is difficult to achieve training when you have one person running a Dollar General store for five hours. FE-11 explained that stores already backed up with excess inventory would often receive truckloads of new, unneeded inventory from distribution centers. When this occurred, store managers could not turn away the delivery.  FE-11 stated, "there's no dial to turn it down, no real process to get that done." FE-11 said that the Company's lack of an effective process for stores to turn down truckloads of unwanted inventory resulted in excessive inventory piling up throughout stores. As FE-11 stated: "You go into any major city Dollar General and half of them are disasters, and a good inspector would shut them down for cleanliness."

65.     FE-11 elaborated that the Company's strategy was to keep the shelves full and limit payroll to the bone, which meant that there were not enough employees to both fill the shelves and run the registers. According to FE-11, Dollar General stores grew so full of inventory that the excess inventory sat in boxes, piled up, and caused OSHA [Occupational Safety and Health Act] violations. FE-11 stated that, due to the Company's chronic understaffing problem, store managers did not have enough time to sort through the store's disorganized inventory to locate additional stock sitting in-store. Thus, managers would frequently fail to check for available in-store inventory, and instead simply marked the item as zero, causing the distribution center to send additional inventory. FE-11 also said there were "huge" issues in the differences between prices on the shelf at stores and the price charged when a product is scanned for purchase. FE-11 explained that prices would change every week and, thus, need to be updated—but with staffing and payroll issues, the prices were not changed in a timely manner at Dollar General.

66.     Former employee #12 ("FE-12") was a Store Manager at the Montrose, Minnesota Dollar General store from June 2019 through August 2023. FE-12 explained that her store was perpetually overstocked and would continuously get new product regardless of how well-stocked it was. According to FE-12, Dollar General stores had no control over inventory management. FE-12 recounted that, when seasonal product arrived, she could not physically fit the product in the store. FE-12 stated: "I worked in the same store (for four years), and it was impacted all the time"—which she described as "severe." FE-12 also said that this excess delivery of merchandise led to a lot of product being thrown out.

67.     Former employee #13 ("FE-13") was an Inventory Checker in the San Antonio, Texas distribution center from November 2021 through November 2022. FE-13 recounted that trailers full of inventory sat in Dollar General's distribution centers' parking lots waiting to be

checked in to the WMS. According to FE-13, when there was finally room for the merchandise in the distribution centers, the product was not properly checked in. FE-13 explained that the proper way to check inventory was by performing physical inventory counts before the merchandise was moved into its rightful place inside the distribution center. However, according to FE-13, the excess inventory at Dollar General made physical inventory counts virtually impossible, including because the distribution centers were littered with pallets of merchandise all over the floor as there was nowhere else to store it. FE-13 said that an inventory checker could not even walk through the floor of the distribution center to ascertain what was on a pallet—and there was a disconnect between what was in the pallet and what was counted as being in the pallet. FE-13 said that the failure to perform physical inventory counts, as per the correct process, made it impossible to get a true handle on the inventory on hand at Dollar General. FE-13 also explained that the distribution center did not receive seasonal items anywhere near the timing of that season, and they had to figure out what to do with that merchandise. FE-13 said that all levels of the distribution center operations knew about these inventory management issues.

**Dollar General Failed to Account for Inventory**

68. As summarized above, several former employees reported that Dollar General lacked basic inventory controls, including for example FE-3, FE-5, FE-6, and FE-13. These consistent reports from insiders who worked at the Company demonstrate that Dollar General could not track the excess inventory that was being stored in its off-site warehouses. Accordingly, the Individual Defendants were necessarily unable to properly account for the inventory in these off-site warehouses, *i.e.*, provide adequate reserves given the inventory's reduced utility to the Company.

69.     Several former Dollar General employees further highlighted the fact that the Company was not adequately accounting for its inventory—and elaborated that Dollar General was improperly disposing of massive amounts of inventory in dumpsters. The facts supplied by these former Company insiders further confirm that the Individual Defendants' inventory-related statements detailed below were materially false and misleading when made.

70.     The multiple former Dollar General employee reports explaining that the Company was not properly tracking, or accounting for, its inventory expose a host of additional statements made by the Individual Defendants as materially false and misleading.  For example, the Individual Defendants assured investors that Dollar General performed "an annual LIFO analysis whereby all merchandise units [we]re considered for inclusion in the index formulation" and an "[a]n actual valuation of inventory . . . at the end of each year." These statements were materially false and misleading because the Company was not tracking all of its inventory and, therefore, it could not possibly have considered "all merchandise" in analyzing inventory and it could not have performed a proper "actual valuation" of its inventory. Relatedly, the Individual Defendants disclosed on a quarterly and annual basis certain key financial metrics that depended on a materially accurate/proper valuation of Dollar General's inventory, including, for example, gross profit and related metrics (as detailed below).  These financial metrics were also rendered materially false and misleading when made by the fact that, as the Individual Defendants knew or ignored, Dollar General was not properly tracking or accounting for inventory, as summarized herein.

71.     For example, former employee #14 ("FE-14") was an Inventory Control Counter in Dollar General's Jonesville, South Carolina distribution center from November 2010 through March 2022. FE-14's job responsibilities included inventory counts.  By the time FE-14 left the Company, she was doing two counts per day because the distribution center was losing track of so

much of the inventory. FE-14 also reported that a lot of product at her distribution center was being thrown away without proper accounting. According to FE-14, Dollar General's distribution centers were required to perform an audit or "inventory count" every quarter to ensure that inventory was stored in the correct amounts and locations reflected in the WMS. FE-14 said that she did not know how the Company passed its inventory counts when the distribution center was disposing of so much product. Indeed, according to FE-14, the Jonesville distribution center was throwing so much product away that a rubbish disposal company was coming two times each day to empty dumpsters. By March 2022, FE-14 reported seeing the dumpsters containing Dollar General inventory being emptied four times in one day. FE-14 stated, "I knew we should not have been able to pass inventory [*i.e.*, inventory counts] but with the way management did the numbers, we somehow passed."

72. FE-14 recounted hearing that 14 trailers of bottled water "went missing" because they were unloaded in another warehouse without being properly input into the WMS. FE-14 also witnessed the hiding of product in trailers. She said that Dollar General employees "would pack product in trailers and put it out on the yard," or other random incorrect locations, which caused the inventory checkers to lose track of the product and not enter it into the WMS. When this happened, according to FE-14, the product was referred to as "stray product," and the proper procedure was to find the correct location and enter it into the system. FE-14 reported that the Jonesville, S.C. distribution center had so much stray inventory to offload that Company management had employees ship it to stores at random, which FE-14 referred to as a "force-out." This resulted in Dollar General stores receiving product that they did not need. Meanwhile, FE-14 said the product was still not accounted for in the WMS. According to FE-14, this practice made

it impossible for the Company to have a handle on inventory, much less to conduct proper inventory management.

73.     FE-14 reported that she was terminated as retaliation for raising these inventory management issues. In the course of performing her duties, FE-14 took it upon herself to spend two-to-three weeks finding product in the distribution center and placing it where it was supposed to go. Instead of appreciating her effort, FE-14 said her managers felt she was overstepping, accused her of doing things that she was not asked to do, and threatened to fire her. At this point, she called Corporate to complain about the Senior Manager of Human Resources, Drake Jackson, and her manager, Janet Andrews. However, instead of performing an investigation into her complaints and the inventory management issues, Dollar General terminated FE-14.

74.     Former employee #15 ("FE-15") worked as a Senior Supply Chain Specialist in Dollar General's Jonesville, South Carolina distribution center from January 2021 to March 2022. FE-15 had significant experience working in the retail supply chain business, as she had worked in supply logistics at Walmart for 30 years prior to joining Dollar General.

75.     FE-15 reported witnessing a significant amount of intentional disregard of compliance with SOX [*i.e.*, the Sarbanes-Oxley Act] at Dollar General. FE-15 said she knew "for a fact" that Dollar General's Jonesville distribution center had over $2 million in physical inventory that was "not showing on paper." She said this was a "nightmare" to someone with her prior experience in retail. FE-15 explained that this $2 million in missing merchandise was simply billed to stores—instead of investigating where the product was and removing it from store invoices. According to FE-15, "Anyone from an external (inventory) counting team could do a count of inventory, and after 30 minutes they'd be able to say this whole thing is built on sand."

76.    FE-15 explained that the Company was hauling away up to four compact trash containers of merchandise a day at the Jonesville distribution center. According to FE-15, extra merchandise would sit on racks without identifying labels, and a supervisor would have to force bill it to a store, which she said was a common occurrence. FE-15 also stated that product was set aside in "rework areas" to determine where it would be stored—but the inventory would be simply thrown away, and not properly "damaged out" [*i.e.*, reduced in value or marked down] in the Company's system. To FE-15, Dollar General's discarding of product without damaging it out of the system via proper accounting was a SOX violation. As FE-15 explained, a company must by law account for all merchandise, even if it is damaged out. But, as FE-15 recounted, this is not the process Dollar General followed, as it did not even have proper documentation for merchandise. FE-15 stated that these practices led to a massive amount of missing and unaccounted for product at Dollar General.

77.    FE-15 said she took her concerns to the highest levels in the Company that she felt she was permitted—*i.e.*, her Vice President—and she "screamed it from the highest mountain." She reported using pictures, videos, and paperwork to try to show how bad things were to higher ups in the Company, including Dollar General directors and assistant directors. FE-15 said that they assured her that action would be taken, but ultimately they appeared to have no interest in doing things the right way.

78.    Former employee #16 ("FE-16") was a Senior Internal Auditor, from May 2017 through April 2023. FE-16 said that the Company's purchasing of merchandise was focused on margin pressure. By the time FE-16 left the Company in April 2023, she said the buyers were "definitely" being instructed to make purchasing decisions based on how it would affect the Company's margins—instead of buying merchandise based on an analysis of actual demand.

79.     As FE-16 explained, depending on what the numbers looked like at the end of a quarter, the Company would buy unnecessary items to bring the margin way down or way up, depending on how they wanted the financial statements to look. She referred to this conduct as "manipulation," explaining that the Company's "margin at the end of a quarter is the number they have achieved . . . but not exactly what the actual margin would be if operating like normal."

80.     Former employee #17 ("FE-17") worked as a Distribution Supervisor in Dollar General's Indianola, Mississippi distribution center, which she said was approximately 800,000 square feet, from 2020 to 2023.

81.     FE-17 reported that inventory at the Dollar General Indianola distribution center was "grossly mismanaged." FE-17 further explained that, at the Indianola distribution center, multiple dumpsters were filled daily with damaged dry goods. She estimated that, in her department (about 1/3 of the facility), $10,000 to $15,000 in damaged sellable freight was being thrown into dumpsters every day—and the total number could "very well" have been three times that for the whole facility. FE-17 further recounted that, when inventory was damaged at her facility, it was thrown away with no way of tracking it. According to FE-17, when something is thrown away, it is supposed to be accounted for through a specific process and, at Dollar General, that process was supposed to be managed by the inventory control department at each distribution center. But FE-17 stated that this process was not followed at Dollar General's Indianola distribution center. Instead, FE-17 reported that "dumpsters full of un-accounted for merchandise were taken away every day." FE-17 also compared notes with Dollar General employees at the distribution center in Jackson, Georgia, which had an "identical" problem.

82.     Former employee #18 ("FE-18") was an Inventory Control/Quality & WMS Super User Manager in Dollar General's Atlanta metro area distribution center that housed perishable

items from May 2021 through January 2022. She reported to Brandy Payne, the distribution center's General Manager.

83. FE-18 stated that inventory at the distribution center was never accurate. As she explained, at Dollar General, when product arrives at the distribution center it is accompanied by a purchase order. According to FE-18, at Dollar General, inventory was routinely accounted for incorrectly and then the purchase order would be closed—and, once closed, the purchase order could not be re-opened. Consequently, FE-18 explained, the Company's inventory control team was unable to ascertain that the purchase orders were short and make the necessary adjustments with the finance team. FE-18 found thousands of improperly accounted for inbound purchase orders, which amounted to millions of dollars' worth of merchandise.

84. FE-18 further explained that inventory was not properly accounted for when received by the Company and it was not properly accounted for when discarded by Dollar General. The Company stored obsolete inventory in the distribution center and, according to FE-18, waste management was called for much of the obsolete merchandise, and it was never properly damaged out by the Company.

85. FE-18 also recounted persistent issues of excess inventory at Dollar General. FE-18's inventory control team would perform physical counts of the merchandise, which were referred to as cycle counts and FE-18's superior, Ms. Payne, had to sign off on them. FE-18 explained that these counts always revealed that inventory was excessively high. When FE-18 would meet with Ms. Payne and tell her they were high, Ms. Payne would laugh and say there was nothing that could be done about it.

86. FE-18 also explained that, when distribution centers sent product to the stores, if there was an error, the stores would create ticket requests for the distribution centers, indicating

that the orders were inaccurate. Dollar General's internal "goal" was to have no more than 10 tickets a day. But FE-18 recounted that her inventory team at the distribution center would receive thousands of these tickets every week—indeed, at one point, FE-18's team was receiving around 6,000 tickets a week from stores.

87.    FE-18 said that she clearly communicated these issues—both in writing and verbally—to her immediate superior, Ms. Payne, as well as the District Operations Manager, and a visiting General Manager. However, according to FE-18, this fell on deaf ears, and she felt her integrity was being compromised. As FE-18 elaborated:

> If you deposit $200 in a bank, you expect to get that (full amount) when you go back and ask for it. If there's only $150 there, you would be upset. The customers are expecting us to hold inventory with integrity, and it was not there.

88.    FE-18 also raised this issue with human resources at the distribution center, as well as with a Dollar General representative at Corporate named Mr. Wilson. Mr. Wilson visited the distribution center and FE-18 explained the inventory issues plaguing the center. Mr. Wilson told FE-18 that he would investigate these issues, but he never got back to her. FE-18 said that there was never any push to make changes and address these problems. Ultimately, FE-18 left the Company because she felt her integrity was jeopardized by these issues.

89.    Former employee #19 ("FE-19") was an Inbound Outbound Operations Manager in Dollar General's Bessemer, Alabama distribution center from November 2019 through November 2022. The distribution center was run by a director who reported to a Regional Director.

90.    In FE-19's experience, the elevated inventory levels at Dollar General were caused by a lack of properly followed process—particularly around accounting for damaged inventory. For example, FE-19 explained that if a "pallet" of inventory fell off a rack in the distribution center and inventory was partially damaged, the correct process for accounting for that merchandise was

to review the inventory, pull out what could be salvaged, and "damage out the rest." However, according to FE-19, this process was not followed at Dollar General. Instead, FE-19 reported that the Company discarded the damaged merchandise without performing the proper accounting for it. FE-19 said she knew "for a fact" that the damaging out of merchandise was not handled correctly in Dollar General's Bessemer distribution center.

91.     Former employee #23 ("FE-23") was a District Manager for 26 Dollar General stores in Arkansas and Missouri from November 2016 through December 2023. FE-23 reported to a Regional Director who reported to a Division Vice President. FE-23 explained that most of the stores she oversaw suffered from excess inventory issues. FE-23 also recounted disarray in the inventory write-down process. She said that stale or outdated inventory needed to be marked down because inventories were climbing. However, FE-23 explained that when district managers marked down the excess inventory they were fired by the Company. As FE-23 explained, this was dead inventory, but it would still be listed at the same price it was listed a year prior. FE-23 said that the Company would twice a year put those items on sale for 50% or buy one get one free, instead of the correct process: instituting a progressive markdown followed by "damaging out" the inventory and allowing a bargain outlet to buy it.

**Chronic Understaffing Exacerbated the Inventory Issues**

92.     With respect to their staffing practices, the Individual Defendants told investors that they "proactively seek ways to continue investing in" Dollar General's employees and boasted of "record staffing levels" at the Company. The Individual Defendants also repeatedly represented that Dollar General stores were "operated by a store manager, one or more assistant store managers, and three or more sales associates"—*i.e.*, four or more employees. Contrary to the

Individual Defendants' representations, multiple former Dollar General employees consistently reported that Company stores suffered from chronic understaffing, as summarized below.

93.     Former employee #20 ("FE-20") worked for Dollar General for almost 15 years holding multiple retail-related positions, the last being a Senior Manager. FE-20 said she visited upwards of 2,500 stores during the period from 2020 to 2023.

94.     FE-20 attributed Dollar General's excess inventory problem to two main reasons: first, Dollar General stores did not have enough people, nor the payroll, to get the stores stocked efficiently and, second, the product sent to the stores via the Company's replenishment system was not the product that the stores needed. With respect to the first issue, FE-20 explained that when product arrived at Dollar General stores, there were never enough "bodies" to get the product onto the shelves. Moreover, FE-20 recounted, because Dollar General stores typically do not have stockrooms, just small receiving rooms, the extra inventory ends up stacked on the sales floor, blocking aisles and egresses. As FE-20 explained, this led to the Company's OSHA violations. FE-20 recounted that Dollar General stores would operate with only one individual during the day for four- to five-hour stretches, which according to FE-20, is inadequate for a store to run properly. Among other things, this resulted in key tasks like price changes not being performed. FE-20 estimated that this occurred at between 30% and 50% of Dollar General stores.

95.     On the second issue, FE-20 said that Dollar General's replenishment system was set up so that product was shipped in full packs, even when only a few items were needed. For example, as FE-20 explained, while a store might have a shelf that holds only eight bottles of Tylenol, the Company would ship multiple cases that hold 12 bottles each. According to FE-20, the excess inventory would sit in the store with no way to have it rotated out to the shelves. FE-20 also recounted that understaffing posed a problem for inventory counts.

96.     FE-20 stated that Dollar General Regional Directors held a meeting at the start of the fiscal year and the District Managers held an annual meeting near the end of July every year. FE-20 said that she occasionally attended these meetings and other attendees included Senior Vice Presidents, Vice Presidents and Directors. FE-20 said she believes that Defendant Owen, when he was COO, attended these meetings at some point. She noted that there was a marked change in the tone and content at the Regional Directors meeting in February 2023, as opposed to previous years. A lot of the topics had to do with safety regulations and getting stores up to standards. To FE-20, this seemed to be a reaction by the Company to the OSHA violations. Further, FE-20 recalled that when she heard about the Company investing $100 million to improve store standards, she understood it was in response to the OSHA violations and regulatory concerns.

97.     Former employee #21 ("FE-21") was a Store Manager at Dollar General's New Braunfels, Texas store from August 2021 to November 2023. FE-21 recounted that the Company insisted that she could only use 119 work hours to schedule seven employees at her store, which was not enough hours for a store to properly function. Further, FE-21 stated that a Dollar General store is supposed to have $15,000 in inventory in its back room, but in some instances, the back room would have $100,000 in inventory because there were not enough staff hours to get the shelves stocked and inventory rotated.

98.     Former employee #22 ("FE-22") worked at the Company from November 2013 to April 2023. She started her career working in Dollar General stores, was promoted to the Corporate side, and eventually became a Senior Project Manager in Project Execution Support, reporting to Dollar General's Director of Project Execution and Support. In this role, FE-22's primary job responsibility was leading remodel projects for Dollar General, and directing a group that oversaw six remodels every week per region.

99. FE-22 stated that, as part of her job responsibilities, she would pre-visit stores before remodels and speak to the District Managers and assess store conditions. FE-22 reported visiting 1,400 stores in 23 states over a two-year period and said that it was common for these stores to have "impacted" stockrooms—which (as noted above) meant that these stock rooms were too packed with inventory to find product. FE-22 attributed Dollar General's excess inventory problems to the fact that there were not enough staff members to put products on shelves to sell it—so instead, product ended up sitting in the store receiving room. FE-22 explained that these inventory management issues were systemic across the Company.

100. FE-22 said that, at the store level, the Company lacked an inventory system that accurately reported the quantity of product or where it was located. FE-22 explained that this stemmed from the fact that there was typically no manifest to accompany truck deliveries to stores—stores would be billed for inventory and the stores accepted whatever arrived without an itemized inventory to check. FE-22 also stated that, at Dollar General, there was a huge discrepancy between the amount of merchandise that came off a truck versus what the store would get billed for. FE-22 stated that the stores had no time to correct inventory discrepancies due to the Company's labor shortage. FE-22 explained that the elevated inventory issue was aggravated by the fact that some small stores were pressed for space causing them to have too much inventory per square foot which in turn led to regulatory compliance issues.

101. FE-23 (the former Dollar General District Manager for 26 stores discussed *supra*) said that most of the stores she oversaw suffered from excess inventory issues—and explained that there is "of course" a correlation between understaffing and the excess/elevated inventory. FE-23 recounted the "terrible stress" on the team caused by this situation, as employees and store managers were constantly having to work overnight and come in early. FE-23 said that senior

leadership at Dollar General knew about these inventory management issues. As she explained, due to regulatory violations, Dollar General started putting cameras in specific places within the stores. FE-23 said it used to be that only the loss prevention group had this sort of access to a store's security systems, but the Company changed this so that district managers all the way up to Senior Vice Presidents could access the cameras in any store nationwide. FE-23 stated that this was a reaction to the workplace safety violations the Company had been charged with. FE-23 said that district managers were mandated to watch the cameras and had to prove that they looked at every store and every view. According to FE-23, there was a tickler system within the program that tracked the number of views by a district manager. FE-23 stated that reports about camera views went up to the divisional level and Tod Boyster, Vice President, Operations.

102.    Former employee #24 ("FE-24") was a District Manager at Dollar General for dozens of stores for multiple years. FE-24 recounted that, during her tenure, the stores she oversaw experienced chronic understaffing. FE-24 also stated that she visited the stores in her district and found them in disarray, suffering from myriad problems with inventory control, staffing, training, and employee retention. FE-24 said she witnessed these issues firsthand, including from store visits attended by the Company's executive leadership. For example, FE-24 recalled visiting a store in Madison, Tennessee with Steve Sutherland (Executive Vice President, Store Operations) and Connie Droge (Senior Vice President, Store Operations) because it had received so many complaints. According to FE-24, the store was a "wreck" during the visit and Mr. Sutherland and Ms. Droge saw boxes of excess inventory blocking fire exits.

103.    FE-24 explained that the excess inventory in Dollar General stores was driven by inaccurate stock counts. According to FE-24, when stores could not provide an accurate accounting of their inventory, the Company would automatically ship them more product. For example, FE-

36

24 stated that, if a store's inventory count showed a certain product was out of stock, the distribution center would register that as requiring an additional shipment, which the system automatically ordered. FE-24 also stated that "force-outs" contributed to the Dollar General stores' excess inventory problem. According to FE-24, a force-out occurred when Dollar General distribution centers, which were suffering from excess inventory problems of their own, would "force" product out to a store that did not need it. FE-24 reported that these force-outs further cramped the already tight spaces at stores—and they happened very often at Dollar General. FE-24 noted that, under Dollar General policy, stores were not allowed to refuse truck deliveries.

104.    FE-24 stated that these problems caused high turnover rates in Dollar General store management positions. According to FE-24, the burden would fall on her, as a District Manager, to fill the turnover in the store manager position with a "warm body," but without adequate resources to ensure competent managers were hired to perform inventory counts. As a result, according to FE-24, the problems were recurring at Dollar General. To make matters worse, FE-24 reported, the Company did not support its in-store employees, including by trimming labor hours.

105.    FE-24 summarized that Dollar General's operations were "not right" from top to bottom. She explained: "I've been in them all [*i.e.*, the stores], and it's the same issues everywhere." FE-24 said that the Company had big box aspirations but used cost-cutter operations, with "disastrous results."

106.    In addition, several additional former Dollar General employees (discussed *supra*) confirmed the labor problems plaguing the Company. For example: (a) FE-10 explained that staffing restrictions were a consistent problem at Dollar General with the lack of hours provided to in-store teams to perform product pushouts causing disorganized stockpiles in inventory areas

that spilled onto sales floors. Indeed, FE-10 said that Dollar General stores lacked the staff to make corrections to the Company's automatic inventory system. According to FE-10, the Company had a store manager internal pipeline structure in place to address the constant store manager turnover—so District Managers were expected to have a pipeline of six associate managers ready at any time to be promoted to store manager due to the turnover. As FE-10 explained, the Company had a chronic issue with turnover because store managers would get burnt out from being overworked and exhausted from all the extra work expected of them as salaried employees. FE-10 said that store manager turnover was a metric that Dollar General tracked closely; (b) FE-19 explained that there was not enough manpower at the Company's Bessemer distribution center, which caused the mishandling of and improper accounting for product. She said the inventory management group at the Bessemer distribution center was "barely manned." As FE-19 explained, there is a correlation between staffing and elevated inventory levels—if a company is barely staffing for the work that needs to get done, then it also does not have the staff (nor time) to enforce the following of standard operating procedures; and (c) likewise, FE-18 explained that employee turnover was a constant issue at the Atlanta metro area distribution center.

**Excess Inventory and Understaffing Created Unsafe Working Conditions**

107.     Employers are required by federal law to provide safe and healthy workplaces. As set forth above, Dollar General had vast amounts of excess inventory constantly being delivered to its stores without any regard for demand—and those stores were woefully understaffed and had limited storage capacity. These problems resulted in massive stockpiles of inventory lining the corridors at stores—to the extent that it blocked fire exits, impeded access to safety equipment, and otherwise created dangerously unsafe work conditions at Dollar General stores.

108.     These unsafe work conditions, in turn, caused Dollar General to face sanctions for regulatory violations under OSHA (the federal Occupational Safety and Health Act, as noted *supra*). Dollar General was the target of a total of 128 OSHA enforcement investigations that resulted in citations for OSHA violations. These included both "repeated" citations, which indicate that Dollar General had similar previous violations, and "willful" citations, which indicate intentional disregard for workplace safety. These citations involved serious violations of safety standards, including repeated fines for failing to have clear paths to fire exits, blocked electrical panels that placed workers at risk of accidental fire, shock, and other damages, and improper stacks of merchandise and over-stocked materials that placed employees at risk of being seriously injured while at work.

109.     For example, in August 2021, following inspections at three Dollar General stores in Mobile, Alabama, OSHA inspectors found five willful violations, including for exposing workers to fire hazards by failing to keep exit routes and workspaces around electrical panels clear, stacking materials in an unsafe manner, and failing to keep receiving areas clean and orderly. These violations exposed Dollar General to $683,680 in penalties under OSHA.

110.     Also, in August 2021, OSHA issued citations to two Dollar General stores in Dalton, Georgia for two willful violations and one repeat violation, which exposed the Company to $364,629 in penalties. OSHA Regional Administrator Kurt Petermeyer in Atlanta stated:

> Dollar General's long and extensive history of workplace safety violations and repeated failures to protect its workers shows willful recklessness. Their blatant and continued disregard for the safety of their employees must come to an end. The U.S. Department of Labor's Occupational Safety and Health Administration will make every effort to hold them accountable for their failures.

111.     On April 22, 2022, U.S. Senator Patty Murray (D-WA), Chair of the Senate Health, Education, Labor, and Pensions (HELP) Committee, wrote to Defendant Vasos demanding

answers for the "unacceptable conditions for workers at Dollar General's stores and warehouses." Senator Murray wrote: "I call on you to explain Dollar General's shameful labor practices and commit to improving conditions for workers moving forward" and issued extensive requests for information from Dollar General.

112.    On May 2, 2022, Dollar General employees coordinated walk-outs at various Dollar General locations. The mass walk-out was prompted by the firing of Mary Gundel, a Dollar General manager in Tampa, Fla., who posted a viral TikTok in which she discussed the poor working conditions at her location. The TikTok sparked a flood of similar videos from other Dollar General Employees, eventually leading to both the mass walk-out, and the United States Department of Labor proposing $3.3 million in fines to be levied on the Company for OSHA violations.

113.    In September 2022, OSHA widened the scope of its Severe Violator Enforcement Program to include as violators any company that willfully or repeatedly violated safety standards. Dollar General was the first company to be added under the program's expanded scope. Douglas L. Parker, Assistant Secretary of Labor for OSHA, said in an interview with *The New York Times*, "What we have found time and time again at Dollar General stores is that there are obvious, preventable hazards that are putting workers at risk." Dollar General downplayed, diminished and denied the problems, stating *inter alia*: "we regularly review and refine our safety programs, and reinforce them through training . . . When we learn of situations where we have failed to live up to this commitment, we work to timely address the issue and ensure that the company's expectations regarding safety are clearly communicated, understood and implemented."

114.    In October 2022, in Waller, Texas, OSHA opened an inspection and discovered blocked exits and walkways, workers at risk of being struck by falling boxes, and boxes blocking

electrical panels. OSHA issued the Company a citation for three safety repeat violations and proposed $294,657 in penalties for these failures. OSHA Regional Administrator Eric S. Harbin in Dallas stated:

> Once again, federal workplace safety inspectors have found Dollar General ignoring required safety measures and allowing blocked emergency exits and walkways that endanger everyone who works and shops at stores where these violations exist. Seconds lost trying to move boxes to reach a fire extinguisher or get out a safety exit can be the difference between life and death in an emergency. Allowing unsafe conditions like these to exist is a tragedy waiting to happen.

115.     In October and November 2022, two Dollar General stores located in Addison and Haleyville, Alabama were cited for safety violations by OSHA. The OSHA inspections found spare shelving, rolling containers and merchandise blocking exit routes, creating fire and entrapment hazards. OSHA also noted walkways blocked by merchandise and unsafely stacked items, exposing workers to trips and hazards from falling merchandise.

116.     In December 2022, similar violations were found at a Dollar General store in Astor, Florida, where OSHA said items blocked fire extinguishers and materials were improperly stored around the space of an electrical panel. OSHA Area Director, Joe Batiz in Birmingham commented, "In one workplace after another, our investigators continue to find the same hazards at Dollar General stores. The Dollar General Corporation needs to make changes to address the recurring violations before there is a tragedy." The three stores were cited for eight repeat violations with proposed penalties of more than $1 million.

117.     Between February 1, 2022 and April 20, 2023, OSHA inspectors assessed Dollar General nearly $9 million in proposed penalties after 28 investigations in Alabama, Florida, and Georgia.

118.     In December 2022, two Dollar General stores in southeast Oklahoma were cited for fire hazards. OSHA investigators found boxes of merchandise blocking walkways at the stores,

which would prevent employees from evacuating in an emergency. Officials said that these are the same types of violations that investigators found in stores across the nation. OSHA issued Dollar General citations for two repeat and three serious violations and proposed $267,622 in penalties. OSHA Area Director Stephen Kirby in Oklahoma City commented:

> Dollar General continues to ignore federal safety standards that would protect its employees and others in its stores. Our inspectors routinely identify hazards caused by poor housekeeping, unsafe storage and by walkways and exits blocked by merchandise. These conditions must be corrected before serious injuries or worse occur in an emergency.

119. In Lamesa, Texas, a December 2022 federal workplace safety inspection found exit routes and walkways were blocked by unsafely stacked merchandise, exposing employees to fire hazards. OSHA cited the company for four repeat violations and proposed $294,646 in penalties. OSHA area director Elizabeth Linda Routh in Lubbock, Texas said:

> Dollar General's pattern of blocking emergency exits and pathways with boxes of merchandise, rolling carts and other materials jeopardizes the safety of everyone in their stores. Poor housekeeping can lead employees to suffer needless injuries and make it hard to exit the store quickly in a crisis. These conditions must be corrected immediately.

120. In January 2023, during an inspection at a Brandon, Florida store, OSHA found exit routes blocked and electrical hazards. Two days later in Dade City, Florida, OSHA inspectors found an emergency exit blocked by rolling containers and merchandise, exposing workers to fire and entrapment hazards. After these inspections, OSHA issued citations to the Company for, *inter alia*, three repeat and two serious violations and proposed penalties of $342,282. An OSHA press release dated July 13, 2023 quotes OSHA Area Director Danelle Jindra from Tampa, Florida as stating:

> After more than 200 failed inspections, Dollar General cannot claim that they misunderstand federal safety requirements. At this point, we can only conclude that they choose to continue exposing their employees to hazardous conditions. Dollar

General must make changes to correct these recurring violations before a worker is needlessly injured or worse.

121.     In an OSHA news release issued on May 23, 2023, Douglas Parker, Assistant Secretary for Occupational Safety and Health was quoted as stating, "Dollar General continues to expose its employees to unsafe conditions at its stores across the nation." He added that the Company must make "corporate-wide changes to protect the safety and well-being of the people they employ."

122.     On July 11, 2024, OSHA announced that it had entered into a settlement agreement with Dollar General to resolve hundreds of outstanding regulatory complaints and citations issued against the Company as a result of the unsafe and hazardous conditions in its stores (defined above as the "OSHA Stipulation"). In connection with this settlement, Dollar General was required to pay $12 million in penalties and implement sweeping, corporate-wide changes to its inventory controls and practices, including to address many of the same deficiencies repeatedly described by the former employees herein.

123.     Further, Dollar General retained an inventory consultant that "analyzed [the Company's] current operating model, including . . . its stores, supply chain, logistics, merchandising, and other technological resources." Based on this analysis, the consultant identified numerous deficiencies in the Company's inventory practices and identified reforms necessary to address excess inventory in "backroom receiving areas" and to "reduce overstock, increase storage capacity, and augment operational efficiencies." The OSHA Stipulation requires Dollar General to implement these reforms, including: "reducing the amount of inventory by stock-keeping unit (SKU) count, reducing the use of floor stands, using closed circuit television (CCTV) cameras to monitor safety issues and to identify stores that may need additional support, and

implementing phased distribution enhancements to improve tote assortment and increase stocking efficiency."

124.    Additionally, the OSHA Stipulation requires Dollar General to "develop and implement policies and procedures to manage truck deliveries" to its stores. These reforms address, among other things, the Company's pervasive practice of "force-outs," *i.e.*, distribution centers offloading excess inventory by shipping it to stores with no need for it, as described by FE-1, FE-14 and FE-24 above. Consistent with these former employees' accounts that the Company gave store managers no effective means to turn away unnecessary deliveries of excess inventory, the OSHA Stipulation requires Dollar General to implement policies authorizing Regional Directors "to stop a truck delivery when appropriate based on a store's backroom capacity that may create reasonable concerns about emergency exit route and safety conditions."

125.    Further corroborating the accounts of multiple former employees set forth herein, Dollar General is also required to implement reforms to prevent excess inventory from dangerously accumulating in its stores. Under the OSHA Stipulation, Dollar General is required to ensure that "sales floor aisles and hallways are free of obstructions" and "totes, other containers, and loose inventory are stacked and limited in height so that they are stable and secure against sliding and collapse." Further, Dollar General stores may "utilize a storage pod to temporarily manage excess inventory, provided that employees can safely access the storage pods to perform work duties at all times" and they must utilize "brightly colored safety lines" and "do not block" signage to ensure clearance around electrical panels and exit doors at Company stores. The OSHA Stipulation also subjects Dollar General to ongoing monitoring and reporting requirements to ensure that the above reforms are properly implemented.

126. Upon information and belief, based upon Stockholder's counsel's investigation into matters of public record, Defendants Vasos and Owen were provided documents on multiple occasions that highlighted the Company's non-compliance with OSHA regulations. For example, Defendants Vasos and Owen received "notice of the Company's blatant workplace safety noncompliance and record-breaking OSHA penalties in 2020" but failed to implement "meaningful corporate reform." Furthermore, instead of "addressing the issue of workplace safety head-on," the Company "chose to sweep its hazardous employee safety violations under the rug," which gave rise to "one, gigantic problem."

**Understaffing and Inventory Issues Gave Rise to Price Discrepancies**

127. Understaffed stores, high turnover and reduced hours for Dollar General employees led to widespread discrepancies between the price Dollar General's customers were charged at the register and the price displayed on the shelf at Dollar General stores. As set forth below, these discrepancies disproportionately led to Dollar General customers being overcharged. Moreover, this happened so often that various state Attorneys General investigated the Company's stores, found the pricing errors to be widespread, and instituted adverse regulatory actions.

128. In November 2022, Ohio Attorney General Dave Yost brought a lawsuit against the Company after an audit found pricing error rates ranging from 16.7% to 88.2% at Dollar General stores located across Ohio. In January 2023, Yost filed a request for a temporary restraining order against the Company, citing ongoing violations of the Ohio Consumer Sales Practices Act because multiple auditors continued to find that many product prices did not match the prices charged by Dollar General. Mr. Yost's office received 116 complaints regarding Dollar General's shelf-pricing issues. Mr. Yost stated: "There's a mountain of evidence showing that Dollar General

simply doesn't care to fix the issue." In October 2023, Dollar General reached a $1 million settlement with the state of Ohio regarding these overpricing issues.

129.    In March 2023, Barron's published an article titled, "When the Price Isn't Right: Dollar General's Record of Overcharging." The article noted that the states of Arizona, Louisiana, Mississippi, and North Carolina also fined Dollar General for similar pricing irregularities in 2021 and 2022.

130.    Former Dollar General employees recounted that the pricing problems were the direct result of the Company's staffing issues. For example, FE-11 stated that store employees faced constant difficulties in carrying out price adjustments of merchandise. According to FE-11, at Dollar General, every week prices changed and needed to be updated—but understaffing caused prices not to be changed in a timely manner. FE-11 said that she witnessed huge issues in the difference between prices on the shelf and when a product is scanned for purchase and elaborated that: "All the prices were off in the stores." FE-11 said that, based on calls that she personally attended, the pricing discrepancies were known to directors at the regional level—such as Regional Director of Operations, Tracy DiBiase, and by the Vice Presidents of each operation zone, who deal with sales. Likewise, FE-10 described that overburdened store employees had to perform price changes in between serving customers and stocking, and on a weekly basis there were sheets of price changes that needed to be worked on. According to FE-10, there was a constant flux of price adjustments, which amounted to up to 20 sheets of price changes a week, and stores were not given more labor hours to change all the prices.

131.    On September 13, 2023, Missouri's Attorney General Andrew Bailey filed suit claiming hundreds of the Company's retail stores in Missouri were offering "unfair and deceptive pricing." Mr. Bailey determined that Dollar General violated Missouri's consumer protection laws

by advertising one price at the shelf and charging a higher price at the register upon checkout. The investigation revealed that price discrepancies ranged up to as much as $6.50 per item, with an average overcharge of $2.71 for over 5,000 items price checked by investigators.

132.    In November 2023, Dollar General agreed to pay over $850,000 for overcharging customers at Company stores in Wisconsin. The Wisconsin Department of Agriculture, Trade, and Consumer Protection verified prices on over 7,000 products in over 200 Dollar General stores and found 662 instances where the prices were higher at checkout than on the shelves. On average, prices were 17% more when they were scanned.

133.    Also in November 2023, Dollar General agreed to pay $1.2 million to resolve claims of overcharging customers in stores in New Jersey.

**The Individual Defendants Continue to Issue False**
**Assurances to Conceal the Ongoing and Unremedied Misconduct**

134.    The Company issued a series of partial disclosures on December 1, 2022, February 23, 2023, March 16, 2023, June 1, 2023, August 31, 2023, March 14, 2024, and May 30, 2024. Through these partial disclosures, the Company gradually revealed, *inter alia*, higher inventory shrink and damages, the Company's need to invest over $170 million to remedy staffing problems, and Dollar General's need to markdown its existing inventory by $95 million. After August 31, 2023, the Individual Defendants told investors that they were remediating the Company's serious inventory problems and that Dollar General was involved in a business turnaround. Critically, the Individual Defendants' misconduct and issuance of false and misleading statements continued, as detailed *infra*.

135.    On December 1, 2022, Dollar General issued a press release prior to market open, and hosted a conference call during market hours, which reported the Company's financial results for the third quarter ended October 28, 2022 ("3Q22"). Among other things, Dollar General

47

reported that its diluted EPS for 3Q22 was $2.33—below the Street consensus of $2.54. The Individual Defendants also revised down their guidance for fiscal year 2022, including their diluted earnings per share estimate, due to "greater-than-anticipated gross margin pressures" related to "inventory shrink and damages" and "higher-than-anticipated supply chain costs."

136. During Dollar General's 3Q22 earnings call on December 1, 2022, Defendant Owen stated, "During the quarter, we experienced significantly higher than anticipated cost pressures, including challenges within our internal supply chain, sales mix pressures, and higher inventory damages and shrink, all of which impacted gross margin." Defendant Owen also stated that the Company faced "more than $40 million in additional supply chain costs in Q3." Defendant Garratt stated that "we are seeing a greater headwind from inventory shrink and damages than we anticipated for the back half of this year."

137. The Individual Defendants also told investors that EPS would rebound in the short-term. Defendant Garratt stated on the 3Q22 earnings call, "But again, as you look at the fundamentals of the business, they're very strong. We continue to see ourselves as 10% EPS growers over the long term."

138. Analysts accepted the Individual Defendants' reassurances, crediting that Dollar General's inventory and supply chain issues were minor, isolated, and temporary. For example: (a) BMO Capital Markets issued an analyst report on December 1, 2022, stating, "DG reported a rare EPS miss in F2Q23 on weaker-than-expected gross margins due to stronger consumables mix shift and supply chain challenges from temporary warehousing, container fees, and inefficiencies . . . the incremental supply chain related costs should be isolated & transitory[.]"; (b) Guggenheim's analyst reported the same day, "Key Message: A rare guide-down, due to somewhat transitory supply chain and sales mix issues, has created an incremental buying opportunity, in our

view. Bottom-line, profit pressure around warehousing capacity constraints will be short-lived while macro-oriented softness in discretionary comps should prove manageable, in our view. In fact, despite reducing 2022 FIFO EBITDA forecast, we raise our 2023 outlook to reflect stronger consumable sales and the resulting expense leverage."; and (c) Oppenheimer's analyst also concluded, on the same day, that "DG reported softer than expected Q3:22 results. EPS of $2.33 fell short of a Street forecast of $2.54, driven primarily by higher supply chain costs. Management also lowered FY22 EPS guidance to growth of 7-8% vs. 12-14% previously, reflecting higher supply chain costs, mix, and shrink/damage. . . . Although the bottom-line delivery was weaker than anticipated, our longer-term thesis remains unchanged as comp momentum remains strong."

139.    On February 23, 2023, the Company issued a Form 8-K reporting preliminary financial results for the fourth quarter and full year ended February 3, 2023 that were below expectations, including disappointing diluted earnings per share. The Individual Defendants disclosed that "higher-than-anticipated inventory damages" caused the Company's "lower-than-expected results."

140.    The Individual Defendants, however, pointed to Winter Storm Elliott as the reason behind the Company's disappointing results. Thus, the Individual Defendants signaled to investors that the Company's inventory problems were due to an isolated, one-time, external event—*i.e.*, a storm—and not the systemic internal deficiencies with Dollar General's inventory controls and staffing levels detailed above.

141.    Analysts accepted the Individual Defendants' assurances. For example: (a) KeyBanc's analyst reported, "Management believes the softer results are primarily attributable to lower than expected sales and higher than anticipated inventory damages, both of which were negatively impacted by Winter Storm Elliott during 4Q22."; (b) Jefferies LLC wrote, "DG's

preannounced result fell short of the company's and Street expectations, largely driven by the negative impacts of the Winter Storm Elliott on sales and inventory damages," and maintained that "DG's FY outlook appears to be achievable, with room for potential upside ahead."; and (c) Telsey Advisory Group wrote, "we are a bit disappointed by the profit impact," but "[t]he good news is that Dollar General is still generating solid sales—aside from the winter storm in December[.]"

142.    On March 16, 2023, the Individual Defendants reported Dollar General's financial results for the fourth quarter (4Q22) and fiscal year ended February 3, 2023 (FY22) in a Form 8-K. The Individual Defendants revealed that Dollar General's results were "below our expectations." The Company reported in its 4Q22 Form 8-K that, "Gross profit as a percentage of net sales was 30.9% in the fourth quarter of 2022 compared to 31.2% in the fourth quarter of 2021, a decrease of 35 basis points." The Company also reported that, "Gross profit as a percentage of net sales was 31.2% in fiscal year 2022, compared to 31.6% in fiscal year 2021, a decrease of 37 basis points." The Individual Defendants attributed each of these "gross profit rate decrease[s]" to an "increased LIFO provision" driven by inter alia "increases in inventory shrink, damages and markdowns."

143.    In the March 16, 2023 Form 8-K, the Individual Defendants also revealed that the Company had to make "an incremental investment of approximately $100 million in our stores, primarily in incremental labor hours."

144.    In a conference call held on March 16, 2023, Defendant Owen stated, "The quarter was also impacted by greater than anticipated inventory damages, which contributed to diluted EPS results that were below our expectations." Defendant Garratt stated that, "[f]or Q4, gross profit as a percentage of sales was 30.9%, a decrease of 35 basis points," which he attributed to

inter alia "an increase in inventory shrink, damages and markdowns." Defendant Garratt also stated that, for 4Q22, "[a]s a percentage of sales, operating profit was 9.1%, a decrease of 6 basis points."

145.    On the March 16, 2023 call, the Individual Defendants also discussed the fact that Dollar General had to remedy its staffing shortfall by making a massive investment in its workforce. For example, Defendant Owen discussed the Company's need to make a "targeted, incremental investment of approximately $100 million in our stores this year," which would "primarily consist of incremental labor hours" including to "drive greater on-shelf availability."

146.    However, the Individual Defendants still reassured investors regarding the Company's inventory and staffing problems, which kept the Company's stock price artificially inflated. For example, on the 4Q22 earnings call, Defendant Owen stated, "However, our December sales performance was negatively impacted by Winter Storm Elliott which had the most significant effect on our stores in the final days leading up to Christmas." Defendant Owen also stated, "we are pleased to have the storage capacity constraints largely behind us which we believe positions us well moving forward." Defendant Garratt maintained that Dollar General's inventory was not a long-term problem, stating, "Importantly, we continue to believe the quality of our inventory is in good shape" and "as we look further, we expect inventory levels to normalize."

147.    Regarding staffing, Defendant Owen assured investors that, for example, "we are pleased with our staffing levels and applicant flow." He further stated, "we feel great about our staffing levels, our ability to attract, and our ability to retain our talent. And so that's why we're investing in hours, and right now we're very pleased to see that wage grow 23% over the last three years. So we're in a great position and that's why we're able to put this investment more towards the hours in the store rather than having to catch up on wages."

148. Analysts credited the Individual Defendants' reassuring statements. For example: (a) Telsey Advisory Group's analyst acknowledged the Winter Storm Elliott explanation, citing "a headwind related to Winter Storm Elliott that pressured sales, damaged inventory, and resulted in higher operating costs."; (b) Goldman Sachs's analyst repeated Defendant Garratt's statement that "lower supply chain costs should be a tailwind with increasing momentum throughout the year."; (c) a Guggenheim analyst wrote that Dollar General's management "expressed a strong belief that the worst of the supply chain disruptions are now behind us . . . Well-positioned and well-run businesses, like DG, do not lose their way overnight, in our view, even during periods of above-average senior management change." The Guggenheim analyst continued, "supply chain should transition from modest headwind to significant tailwind now that new capacity has been brought online and costs are normalizing."; and (d) Piper Sandler's analyst stated, "We continue to think DG will be a beacon of stability in 2023, with greater upside potential if the economy slows[.]"

149. On June 1, 2023, Dollar General reported its financial results for the quarter ended May 5, 2023 (1Q23) in a Form 8-K and a Form 10-Q. The Individual Defendants reported inter alia diluted earnings per share of $2.34 in 1Q23, a decrease of 2.9% from $2.41 in 1Q22; and operating profit of $740.9 million in 1Q23, a decrease of 0.7% from $746 million in 1Q22. They also reported that total merchandise inventories were $7.3 billion compared to $6.1 billion as of April 29, 2022. Further, the Individual Defendants slashed Dollar General's outlook for fiscal full year 2023 ("FY23"), including by disclosing that they expected inter alia the Company's diluted earnings per share to be "in the range of an approximate 8% decline to flat."

150. In Dollar General's Form 10-Q also filed on June 1, 2023, the Individual Defendants reported the above financial metrics and stated:

During the second half of 2022, we experienced higher inventory damages and shrink than we anticipated, which we believe was due primarily to the challenging macroeconomic environment, materially higher inventory levels, and, as to damages, Winter Storm Elliot in December. In addition, we believe some portion of the increase in damages was a residual impact of the warehouse capacity constraints and associated store and supply chain inefficiencies we faced during the same period. We continued to experience higher shrink and inventory damages in the first quarter of 2023.

151.    Also on June 1, 2023, the Individual Defendants held a conference call to discuss Dollar General's 1Q23 results. On inventory, Defendant Dilts reported "increases in shrink, markdowns and inventory damages." Regarding staffing, Defendant Dilts revealed on the June 1, 2023 call that, of the $100 million investment, the Company had to "pull[] forward a larger portion of our labor investment and anticipate more than $40 million of the investment will be made in the second quarter." Defendant Owen also stated that they were "pulling forward our labor investment into the second quarter," including to "make improvements in the store that we need to do."

152.    However, once again the Individual Defendants failed to disclose the full truth regarding Dollar General's business and operations, causing the price of Dollar General stock to remain artificially inflated. For example, with respect to the Company's increased inventory levels, Dollar General's Form 8-K misleadingly stated that the "increase primarily reflects the impact of product cost inflation." In Dollar General's Form 10-Q, as noted in the above quote, the Individual Defendants attributed the Company's higher inventory damages to inter alia "Winter Storm Elliott in December."

153.    The Individual Defendants also falsely assured investors that the Company's inventory problems were under control. For example, during the June 1, 2023 earnings call, Defendant Dilts stated that the "pace" of inventory growth had "moderated from its peak last year" and "[l]ooking ahead, we plan to further sharpen our focus on inventory and we continue to

anticipate more normalized growth rates as we move through the back half of the year. Importantly, we continue to believe the quality of our inventory is in good shape."

154.     During the June 1, 2023 conference call, an analyst noted that Dollar General's "inventory balance was up . . . 20% year-over-year" and asked the Individual Defendants "how [they] feel about the health of the inventory position"? Defendant Dilts responded: "We continue to feel good about the quality of the inventory" and stated, "we're going to continue working on reducing those [inventory] levels . . . and we believe that the new structure we've put in place will make sure that we get that done."

155.     Analysts were surprised by these disclosures, but credited the Individual Defendants' reassuring statements. For example: (a) Guggenheim analysts accepted the Individual Defendants' assurances that the Company's inventory problems were under control, and thus would "limit the scope for markdowns later in the year. With the supply chain fixed, it will be possible to chase sales if demand is stronger than expected."; (b) Wolfe Research analysts credited the Individual Defendants' reports of "positive results" from Dollar General's $100 million investment in labor. Evercore analysts stated "[t]he $100mn in labor investment is helping to improve customer perception of store experience, with $27mn in Q1 and an incremental $40mn in Q2, as management pulls ahead the spend to drive traffic."; (c) TAG analysts credited the Individual Defendants' claims of "improving the operating model, supply chain, and inventory management," and "focusing on associates."; and (d) Argus analysts credited the Individual Defendants' assurances about its inventory improvements, writing: "DG's logistics are very efficient, with procedures for loading trucks and delivering merchandise that allow stores to quickly restock their shelves."

156.     On August 31, 2023, Dollar General surprised the market by reporting disastrous financial results for the second quarter of 2023 ended August 4, 2023 ("2Q23") in a Form 8-K and Form 10-Q. The Company reported that the Company's operating profit was $692.3 million in 2Q23, a decrease of 24.2% from $913.4 million in the prior quarter; net income was $468.8 million in 2Q23, a decrease of 30.9% from $678 million in the prior quarter; and diluted earnings per share were $2.13, a decrease of 28.5% from the prior quarter. The Individual Defendants also revealed that gross profit as a percentage of sales was 31.1% in 2Q23 compared to 32.3% in 2Q22, "a decrease of 126 basis points," which they attributed to inter alia "increased shrink, markdowns, and inventory damages." Further, Dollar General disclosed that total merchandise inventories were $7.5 billion compared to $6.9 billion the prior year.

157.     In the Company's August 31, 2023 press release regarding the 2Q23 results, the Individual Defendants also disclosed that they now expected "an incremental operating profit headwind of up to $170 million in the second half of 2023" due to their need to "accelerate the pace of [Dollar General's] inventory reduction efforts," make "additional investments in targeted areas, such as retail labor," and due to "an increase in expected inventory shrink for the second half of 2023." Specifically, the Individual Defendants disclosed they "now expect approximately $100 million of additional shrink headwind since last quarter's call." Thus, the Individual Defendants had to reduce their outlook for Dollar General's fiscal year 2023, including by revising down diluted earnings per share to "approximately $7.10 to $8.30, or a decline of 34% to 22%, compared to its previous year-over-year change expectation of an approximate 8% decline to flat growth." The Individual Defendants also had to decrease their expectations for net sales growth and same-store sales growth for fiscal year 2023.

158.     On the Company's conference call held on August 31, 2023: (a) Defendant Owen stated that they expected markdowns on Dollar General's inventory to "result in an operating profit headwind of approximately $95 million in the back half of the year," including to "more quickly reduce excess inventory."; (b) Defendant Owen also stated that the Company was increasing its "planned investment in incremental retail labor from approximately $100 million this year to approximately $150 million"—an increase of $50 million; (c) Defendant Owen further stated that they planned "to invest up to $25 million" including in "an improved inventory demand forecasting tool to better support our stores and distribution centers."; and (d) Defendant Dilts explained that the expected $170 million investment, which directly impacted operating profit, represented nearly "$0.60 of EPS" and was "due to the increased markdown activity, additional labor, and investments in other areas." Also on the August 31, 2023 earnings call, Defendant Dilts disclosed that the Company expected "approximately $100 million of additional shrink headwind since last quarter's call."

159.     However, the Individual Defendants reassured investors that the Company was successfully and proactively addressing its inventory problems, which caused the price of Dollar General stock to remain artificially inflated. For example: (a) Defendant Owen assured investors that the Individual Defendants had made "significant progress" including in "reducing our inventory growth rate."; (b) In response to an analyst question, Defendant Owen stated that the Company is "starting to see the theme of stability" and, therefore, the $150 million investment was "the right amount to get us to excellence that we're accustomed to achieving . . . through the back half of . . . 2023."; (c) when asked about "comps and where they're performing," Defendant Owen responded that he felt "Really good about the plan on driving continued performance," particularly because of "the labor investment we've made, the signs that we're seeing[.]"; (d) Defendant Owen

also stated that, "service levels, in-stock levels, and on-time delivery rates from our distribution centers have all returned to the levels we saw before our capacity challenges began last year," which has "benefited our overall supply chain cost."; and (e) Defendant Dilts told investors that the Company had "made progress towards our goal of reducing inventory growth rates by the end of the year" and that "we continue to believe the quality of our inventory is in good shape."

160.    Further, throughout the August 31, 2023 earnings call, the Individual Defendants emphasized their expectation that the Company's inventory problems would be resolved in, for example, "the back half of the year." Indeed, when asked about the Company returning to its prior growth rates "by 2024," Defendant Dilts responded affirmatively, stating that, "we feel good about the investments that we're making and the ability for those to set us up for 2024 and beyond."

161.    Analysts were surprised by Dollar General's continued inventory and labor problems—but also were comforted by the Individual Defendants' reassurances that the Company was addressing these problems and would recover in the near term. For example: (a) Evercore's analyst stated, "the company is making necessary investments to clean up inventory, improve its store labor/shopping experience, and enhance[e] its price perception as well as its overall supply chain infrastructure. . . . Bottom line: DG is taking painful but necessary action to address several key challenges we see facing the business: store labor, supply chain, inventory and pricing."; (b) The Loop Capital analyst wrote, "Management outlines turnaround initiatives. Management outlined the following turnaround initiatives: (1) increasing promotional markdowns (primarily in discretionary items) by $95M in F2H 2023; (2) increasing its planned F2023 store labor investments to $150M from $100M (including $80M in F2H 2023); and (3) investing $25M in other areas, including an improved demand forecasting tool."; (c) The Raymond James analyst wrote, "While today's cut is meaningful we believe the accelerated wage and inventory actions are

the right strategy given today's retail environment (DG's peers are investing in wages)."; and (d) BMO Capital Markets' analyst wrote, "Certain Pressures May Prove Transitory. From a gross margin standpoint, our new F25E EPS assumes $95mm out of the $195mm shrink and markdown pressure called out this year may revert next year."

162.    These disclosures caused the price of Dollar General's stock to decline by $19.16 per share, or 12%, from a closing price of $157.66 on August 30, 2023 to a closing price of $138.50 on August 31, 2023, on unusually high trading volume of more than 19.3 million shares. As the market continued to react to the Company's negative disclosures, the Company's share price declined another 5.94% on September 1, 2023, closing that day at $130.27 per share, on unusually high trading volume of more than 10.6 million shares. And after the Labor Day weekend (when the markets were closed), on September 5, 2023, Dollar General's share price continued to decline another 2.34%, closing at $126.46 per share that day, on unusually high trading volume of over 8 million shares. Finally, on September 6, 2023, the stock price declined another 0.6% to close at $126.46 per share that day, on unusually high trading volume of over 5.5 million shares.

163.    On October 12, 2023, the Company announced that Defendant Owen was being terminated less than a year after he was appointed as CEO. As noted above, when announcing Defendant Owen's termination, the Company's Chairman of the Board stated: "[t]he Board has determined that a change in leadership is necessary to restore stability and confidence in the Company moving forward." Defendant Owen was replaced by Defendant Vasos.

164.    Analysts were comforted that the CEO change further signaled that Dollar General had a handle on its problems and was on the road to recovery. For example: (a) Oppenheimer's analyst wrote, "Following significant execution challenges in recent quarters, we believe this change will be well-received by investors and could help to reinstill confidence in the longer-term

DG bull case."; and (b) Evercore ISI's analyst similarly stated that the CEO change would "likely be viewed as a positive step in stabilizing the business and rebuilding investor trust."

165.    Investors were also reassured. In response to this news, Dollar General's stock price *increased* over 9%, from a closing price of $101.83 on October 12, 2023, to a closing price of $111.16 on October 13, 2023, on unusually high trading volume shares.

166.    On December 7, 2023, Dollar General reported its financial results for the quarter ended November 3, 2023 (3Q23) in an earnings release attached to Form 8-K, a Form 10-Q, and an earnings call. The Company reported that the Company's operating profit was $433.5 million in 3Q23, a decrease of 41.1% from $735.5 million in 3Q22; net income was $276.2 million in 3Q23, a decrease of 47.5% from $526.2 million in 3Q22; and diluted earnings per share were $1.26, a decrease of 45.9% from 3Q22. The Individual Defendants also revealed that gross profit as a percentage of sales was 29.0% in 3Q23 compared to 30.5% in 3Q22, "a decrease of 147 basis points," which they attributed to, inter alia, "increased shrink, lower inventory markups, and increased markdowns." Dollar General's 3Q23 press release quoted Defendant Vasos as stating: "Over the last several weeks, we have spent significant time reviewing all areas of the business, and we have identified key opportunities for improvement both in the near term and over the longer term."

167.    In Defendant Vasos's first earnings call after his return as CEO, the Company announced the launch of its "Back to Basics" remediation plan. This campaign involved dedicating labor hours to "store-level inventory management activities," including "reemphasizing the role played by [Company] store teams in our perpetual inventory management process." Defendant Vasos also announced a plan to "better optimize the inventory within our distribution centers," including by "taking steps to reduce inventory" and "reducing the number of temporary outside

warehouse facilities being used to store product as inventory flows more effectively to and through our existing distribution centers." He further stated, "we expect to transition out of many of" the temporary warehouse facilities "in Q4 and into next year."

168.    Also, on the 3Q23 earnings call, the Individual Defendants made several statements to reassure investors that the Company was experiencing a turnaround. For example: (a) Defendant Vasos stated, "After starting the quarter slightly negative, traffic turned positive in the middle period and improved sequentially each period of the quarter" and that they saw "early traction from our work on getting back to the basics here at Dollar General."; (b) Defendant Vasos also reassured investors that the Company would see improvement in the near term. For example, Defendant Vasos stated "we've [sic] actually have seen our in-stock rates markedly improve over the last few weeks."; (c) When an analyst asked about the expected timing of the Company's inventory initiatives, Defendant Dilts responded, "we should feel pretty good about where we're landing at the end of 2023, but we're going to feel even better as we see continued improvement in inventory levels as we move through 2024." Defendant Vasos echoed this, stating that he felt "very good about what we see going into the back half of this year and 2024."; and (d) Defendant Dilts stated that the shrink headwind was something "we're mitigating along the way." Likewise, she stated: "Partially offsetting [shrink] challenges, we expect benefits from greater distribution center capacity and performance."

169.    Analysts were comforted by the Individual Defendants' reassuring statements. For example: (a) Evercore ISI's analyst stated, "Bottom line: DG is taking action to turn its comps positive and stabilize margin," and noted Defendant Vasos's "plans to stabilize traffic, manage inventory and enhance store labor."; (b) Jefferies' analyst stated: "We LIKED In The Quarter" that "Inventory Management Continues to Be a Priority" and noted that as "a part of the new CEO's

recent assessment of the business, DG is reemphasizing the stores' role in its inventory management as well as rationalizing underperforming SKUs."; and (c) Oppenheimer's analyst credited "CEO Todd Vasos's commentary" that "suggests the company has identified key opportunities for improvement both in the near term and over the longer term." The analyst also flagged that "management announced more conservative growth plans, which we believe will be well-received by the market." The analyst concluded, "We view today's actions as a step in the right direction to help stabilize profitability."

170.    On March 14, 2024, Dollar General reported its financial results for the fourth quarter (4Q23) and fiscal year (FY23) ended February 2, 2024 in an earnings release attached to a Form 8-K. The Individual Defendants reported, *inter alia*, decreased operating profit of $579.7 million in 4Q23, which was down 37.9% from $933.2 million in 4Q22, and operating profit of $2.4 billion in FY23, which was down 26.5% from $3.3 billion in FY22. Dollar General's net income was $401.8 million for 4Q23, a decrease of 39% from $659.1 million in 4Q22, and $1.7 billion for FY23, a decrease of 31.2% from $2.4 billion in FY2022. The Company's reported diluted earnings per share was $1.83 in 4Q23, a decrease of 38.2% from $2.96 in 4Q22, and was $7.55 in FY23, a decrease of 29.3% from $10.68 in FY22. Dollar General's reported gross profit as a percentage of net sales decreased 138 basis points from 4Q22 to 4Q23 to 29.5% and decreased by 94 basis points from FY22 to FY23 to 30.3%. The Individual Defendants attributed the 4Q23 and FY23 gross profit declines to inter alia "increased shrink and inventory markdowns." The Individual Defendants also provided full year financial guidance, including diluted earnings per share "in the range of approximately $6.80 to $7.55."

171.    Also on March 14, 2024, the Individual Defendants held an earnings conference call to discuss the Company's results. On that call: (a) Defendant Vasos acknowledged that the

Company faced inventory "shrink headwinds" and "more markdowns."; (b) He also discussed the Company's ongoing inventory remediation efforts, which included "adding specific inventory management shifts and specialized inventory training in each store;" efforts to "continue inventory flow"; and added "labor . . . to keep our on-hand and perpetual inventory counts more accurate."; and (c) Tellingly, Defendant Vasos admitted, "any time you have too much inventory in the store, you've got too much shrink and damages" and "damages, by the way, is just known shrink."

172.     However, the Individual Defendants failed to disclose the full truth regarding Dollar General's inventory problems, which caused the price of Dollar General's stock to remain artificially inflated. Indeed, to reassure investors, the Individual Defendants represented that Dollar General was on the road to recovery. For example, in the Company's March 14, 2024 earnings release: (a) Defendant Vasos was quoted as saying "[w]e have made solid progress executing on our 'Back to Basics' strategy, which we believe supported our improved operational performance during the quarter"; "we are pleased with the operational improvement we have seen" and still "believe that significant opportunity remains"; and we "are confident that we are taking the right actions to further solidify our foundation for future growth and create sustainable long-term value for our shareholders."; and (b) Defendant Dilts was quoted as saying regarding the Company's outlook "[w]e are encouraged by the progress we are making with our efforts in getting Back to the Basics, and we anticipate the benefit of these actions will continue to grow as we move throughout fiscal year 2024" and highlighted "anticipated strong EPS growth in the back half of the year."

173.     On the 4Q23 earnings call, the Individual Defendants continued to reassure investors that the Individual Defendants were remedying Dollar General's inventory problems. For example: (a) Defendant Vasos stated that the Individual Defendants' Back to Basics

remediation plan "will have a significant mitigation impact in the back half of the year and into 2025" and result in "improvements in financial results, including sales and shrink."; (b) Defendant Vasos also stated "I believe that we'll be in a really good position . . . especially to start delivering on that EPS growth of 10%-plus," as shrink and other poorly performing metrics "start to heal."; (c) He explained that the Company would remove self-checkout from approximately 9,000 stores with a focus on "more than 300 of our highest shrink stores" in order to "have a material and positive impact on shrink as we move into the back half of the year and into 2025."; and (d) he also claimed that "Since Q3, we have seen significant improvements in our on-time deliveries as well as customer service levels" and expected to reduce product by 1,000 SKUs.

174.    Defendant Vasos also sought to reassure the market regarding the efficacy of the Individual Defendants' labor investment. For example, Defendant Vasos stated "we have done a lot of work in ensuring we've got the right amount of labor inside our stores, $150 million in labor investments in 2023."

175.    Analysts were concerned about Dollar General's continuing inventory problems but reassured by the Individual Defendants' insistence that their Back to Basics remediation campaign was working. For example: (a) Piper Sandler's analyst stated "DG missed on gross margin (-140 bps y/y) mostly on shrink and mix headwinds. While shrink was noted as a significant margin headwind that will continue near-term, mgmt. highlighted an array of initiatives to reduce the effects, which should be felt in 2H. Also of note, inventory levels improved meaningfully, DG continues to make changes on the labor front, and there are signs of impending Discretionary stabilization. Despite this, 2024 EPS was guided to $7.18 at the midpoint—below consensus of $7.42."; (b) Barclays' analyst wrote, "Gross margin weaker but inventory improving; GM was down about 140 bps reflecting similar issues to last quarter, although margins did improve

sequentially from Q3 which they typically do. Importantly, inventory is getting cleaner, down 1.1% y/y on a per store basis." In a follow-up report, the analyst wrote, "Company seems to have clear mitigation plans in place, including added labor (in SG&A)."; and (c) Evercore ISI's analyst emphasized that the Company's same-store sales guidance "suggests DG could return to its traditional performance," and that, "DG has been making necessary investments to 1) clean up inventory, 2) improve its store labor/shopping experience, 3) enhance its price competitiveness and 4) shore up its distribution infrastructure."

176.    On May 30, 2024, Dollar General reported its financial results for the first quarter ended May 3, 2024 (1Q24) in an earnings release attached to Form 8-K, a Form 10-Q, and an earnings call. The Individual Defendants reported, inter alia, that Dollar General's gross profit as a percentage of sales was 30.2% in 1Q24, a decrease of 145 basis points from 31.6% in 1Q23, which the Individual Defendants attributed to inter alia "increased shrink and inventory markdowns." Dollar General's reported operating profit was $546.1 million in 1Q24, a decrease of 26.3% from $740.9 million in 1Q23; net income was $363.3 million in 1Q24, a decrease of 29.4% compared to $514.4 million in 1Q23; and diluted earnings per share decreased to $1.65 for 1Q24, down 29.5% from $2.34 in 1Q23. In addition, the Individual Defendants reaffirmed their previously provided fiscal year financial guidance, including diluted earnings per share "in the range of approximately $6.80 to $7.55."

177.    Also on May 30, 2024, the Individual Defendants held the Company's 1Q24 earnings call. On the call, Defendant Vasos disclosed that "Shrink continues to be the most significant headwind in our business." Likewise, Defendant Dilts stated "Shrink continues to be our most significant headwind and was 59 basis points worse in the first quarter compared to prior year." She continued, "shrink is currently trending worse than we initially expected coming into

the year, and we now expect this headwind to be greater in 2024 than what was originally contemplated in the financial guidance we provided on our earnings call in March."

178. However, the Individual Defendants continued to insist that they were mitigating the Company's continued inventory problems, including by addressing increased shrink. For example: (a) When asked, "why is shrink worse than you expected," Defendant Vasos responded that while shrink "will take a little longer to manifest itself in a real positive manner," the Company's "proprietary predictive model" and "shrink indicators" "are now flashing green or positive with the majority of the items we look at for shrink." Accordingly, he continued, "we feel pretty good about what that would indicate for the back half of the year and what that will indicate hopefully for 2025 and beyond."; (b) In response to an analyst question about the Back to Basics initiative, Defendant Vasos replied that while shrink is, "A little worse than we thought in Q1," there were still "green shoots" which "really give us the confidence to reiterate our guidance for full year because we're starting to see some of that occur, and of course, those positive sales and transactions, I don't want to minimize that."; (c) Similarly, when asked about "the level of investment required to address shrink," Defendant Vasos stated: "I just want to reiterate, shrink was worse than we thought it would have been in Q1, but we are seeing those green shoots, which gives us confidence to reiterate our guidance long-term."; (d) Defendant Dilts stated, "We're taking aggressive and decisive action to mitigate this challenge. And we're expecting to see improvement later in the back half of 2024 than we had previously anticipated and more significantly into 2025." She also emphasized, "we do expect to see improvement in the second half of the year."; and (e) When asked if she was confident in the "pretty strong second half profit recovery" predicted by the Company's full year guidance, Defendant Dilts stated, "we are certainly pleased to be able to reiterate our guidance that we gave. And to your point, it does indicate a

stronger back half, and we really see the momentum of our actions on all of our 'Back to Basic' work will fuel that back half, and looking forward to a strong top line and bottom line growth in the back half."

179. Analysts reacted to these disclosures by noting the negative impact of Dollar General's increased shrink but echoing the Individual Defendants' positive outlook on the Company's purported turnaround. For example: (a) J.P. Morgan's analyst lowered his gross margin estimate and wrote "On shrink: mgmt. cited 1Q shrink came in worse than expected, but is seeing 'greenshoots' to reiterate its long term confidence around shrink recapture."; (b) KeyBanc's analyst expressed disappointment in Dollar General's increased shrink but credited the Individual Defendants' turnaround efforts, stating: "Management is encouraged by the continued progress in executing the Company's 'Back to the Basics' strategy. Management noted that shrink and sales mix headwinds are greater than initially anticipated, but the Company is working to mitigate the impact of these challenges and is still able to reiterate its full-year guidance." In a follow-up report, the analyst reiterated, "The outlook for shrink and discretionary mix remain overhang s for the MT margin outlook for DG. 1Q results showed improvement, with solid comps, but margins still pressured by the aforementioned factors."; (c) Piper Sandler's analyst stated "EPS guidance for Q2 was set below expectations which now makes the margin rebound in 2H implied in guidance look even more significant." The analyst continued, "YTD, shrink is trending slightly worse than expected. While DG continues shrink reduction efforts and is starting to see green shoots, mgmt. noted improvement is expected later on in 2H24 than previously anticipated – with much to be seen in 2025."; (d) Telsey Advisory Group's analyst noted that the earnings per share guidance was "soft," attributable to "the unfavorable product mix and higher shrink, markdowns, and labor costs." But the analyst was generally "encouraged by the continued positive comp and

traffic trends, as well as market share gains."; and (e) Barclays' analyst noted that the Company's EPS guidance was below consensus, and that "commentary suggested shrink and mix headwinds greater than initially expected coming into year," but stated "we were encouraged by better sales and reduction in inventory[.]"

**The Truth is Fully Revealed**

180.     Despite the assurances described above, it was not until August 29, 2024, the Individual Defendants finally revealed that the Company's inventory problems were far more severe, wide-ranging, and persistent than previously disclosed. These corrective disclosures caused the price of Dollar General's stock to decline significantly on high trading volume—and, collectively, they wiped out billions of dollars in shareholder value.

181.     On August 29, 2024, Dollar General reported its financial results for the second quarter ended August 2, 2024 (2Q24) in an earnings release attached to Form 8-K, on a Form 10-Q, and in an earnings call. The Individual Defendants reported that, inter alia, gross profit as a percentage of net sales was 30% in 2Q24, a decrease of 112 basis points from 31.1% in 2Q23, which they attributed to inter alia "increased markdowns," "increased inventory damages," and "increased shrink." Dollar General also reported (i) operating profit of $550 million in 2Q24, a decrease of 20.6% from $692.3 million in 2Q23; (ii) net income of $374.2 million for 2Q24, a decrease of 20.2% compared to $468.8 million in 2Q23; and (iii) diluted earnings per share of $1.70 for 2Q24, a decrease of 20.2% compared to diluted EPS of $2.13 in 2Q23.

182.     Finally acknowledging that the Company's inventory problems were more severe, far-ranging, and persistent than previously disclosed, the Individual Defendants significantly cut Dollar General's financial guidance, including by slashing diluted earnings per share expectations. For example, the Individual Defendants reported that they now expected inter alia Dollar General's

"diluted earnings per share [to be] in the range of approximately $5.50 to $6.20, compared to its previous expectation of approximately $6.80 to $7.55.

183.    On the 2Q24 earnings call, the Individual Defendants acknowledged the disappointing results and outlook. For example: (a) Defendant Vasos admitted that the Individual Defendants were "not satisfied by [the Company's] overall financial results." Likewise, Defendant Dilts stated "we're not satisfied with the financial results for the second quarter."; (b) Defendant Dilts explained that "shrink was a year-over-year headwind of 21 basis points in Q2" and shrink "continues to be a significant headwind."; (c) as to financial outlook, Defendant Dilts said, "[t]urning to gross margin, we expect additional pressure as a result of the increased promotional markdown activity"; "with regard to damages, our guidance now assumes no improvements in the back half of the year"; and "we expect shrink to be a headwind for the full year."; (d) in response to an analyst question regarding markdowns, Defendant Dilts stated that "what we're looking at in this back half is going to be a similar markdown rate to what we saw last year in the back half . . . So more than we had anticipated."; (e) Defendant Dilts further stated that they "we're certainly experiencing" "shrink and mix headwinds" and that "the damage piece of this as well is putting a little pressure on the second half."; (f) Defendant Vasos also admitted that "margin" is a "bump[] in the road" and that "now, shrink is a constant battle."; and (g) in response to a question about the revised guidance, Defendant Dilts responded that it was "margin and then the markdowns" that were "really the primary drivers."

184.    In sum, the August 29, 2024 disclosures revealed to the market that, contrary to their assurances over the prior year, the Company's inventory problems were more severe, far-ranging, and persistent than previously disclosed.

185. Analysts were shocked to discover that, after multiple quarters of assurances that the Company was remedying its inventory issues, the Company still faced such significant and persistent inventory-related problems, including increased shrink, markdowns, and damages. For example: (a) Barclays's analyst wrote: "we believe damages haven't improved as much as expected yet, and that's what is embedded in new guidance (in addition to markdown and mix headwinds)"; (b) BNP Paribas's analyst stated: "Margins take another sizable reset lower, hard to see a path to recovery" in part because "incremental markdowns given elevated promotional activity" "could drive ~40bps of pressure in 2H"; markdowns and shrink were two of the three points that the analyst said were "reflecting ongoing pressure through the P&L."; (c) HSBC's analyst criticized the Company's miss in gross margin and operating income, and stated that, "DG plans to increase promotional and markdown activity efforts during 2H in order to drive store traffic and improve sales performance."; (d) Piper Sandler's analyst wrote, "Q2 Miss and Guide Down Seems to Represent a Seminal Moment for DG" and lowered his price target for the Company. The analyst wrote: "What's New? (1) Significant Reduction in Guidance. DG reduced full year guidance at the midpoint by -18% to a new range of $5.50-$6.20. . . . DG didn't guide gross margin but increased markdowns are expected (see below). . . . (3) Increasing Promotions to Drive Sales. DG plans to continue its promo activity through 2H – which will place markdown activity flat y/y."

186. These disclosures caused Dollar General's stock to decline by a staggering $39.81, or over 32%, from a closing price of $123.84 on August 28, 2024 to a closing price of $84.03 on August 29, 2024 on abnormally high trading volume.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

187. During the foregoing misconduct, the Individual Defendants issued, or caused the Company to issue, false and misleading statements to the market and failed to correct these statements despite being aware, in their fiduciary roles as officers and directors, of the truth, as detailed above.

188. On May 28, 2020, Dollar General issued a press release providing the Company's results for the first quarter ended May 1, 2020. The press release stated that net sales increased 27.6%, same-store sales increased 21.7%, and operating profit increased 69.2%, while diluted EPS increased 73% to $2.56. It also emphasized that "[g]ross profit as a percentage of net sales was 30.7% in the first quarter of 2020 . . . , an increase of 49 basis points," noting that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales and higher initial markups on inventory purchases."

189. The same day, the Company hosted an earnings call with analysts and investors to discuss its financial results from the quarter. During the Q&A portion of the conference call, Defendant Owen, the Company's then-COO, praised Dollar General's strong store merchandizing and stocking capabilities, stating in relevant part:

> I'm extremely proud of the way the team responded to the in-stock challenges that all retailers faced. And our merchant team was involved very, very early with our suppliers in partnering with ways to get our fair share of product, but also thinking about creative ways to provide alternative pack sizes or substitute items for our stores. And then also, we were able to stand up even new SKUs during this period of time. So [the] merchant team did an outstanding job and then the supply chain, obviously, you can't do that without the supply chain. So they were able to flex up to our demand. And then also, they're able to deliver the product to our stores on time. And then finally, as Todd mentioned as well, Fast Track earlier is – was one of our initiatives that really paid off during this because the stores were able to get the product on the shelf.
>
> As I think out and when it will end, a lot of that depends on the customer. And it also depends on the way the economy in terms of the shelter in place. So as you know, many of the nation is opened up for business now, so we'll have to wait and see. But I can tell you this, our supply chain is ready to deliver the product to the

stores when it's available, and our store teams are ready to get it on the shelf. So we'll be in a great position for the customer once the products are available.

190.    Also on May 28, 2020, the Company filed its quarterly report for the first quarter ended May 1, 2020 on form 10-Q with the SEC (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and Garratt.

191.    The 1Q20 Form 10-Q provided the same financial results for the quarter as the press release detailed above, and stated that "[g]ross profit, as a percentage of net sales, was 30.7% in the 2020 period . . . , an increase of 49 basis points, primarily reflecting favorable markdowns and higher initial inventory markups." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 1Q20 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

192.    On August 27, 2020, Dollar General issued a press release providing the Company's results for the second quarter ended July 31, 2020. The press release reported net sales increased 24.4%, same-store sales increased 18.8%, and operating profit increased 80.5%, while diluted EPS increased 89.1% to $3.12. The press release also emphasized that "[g]ross profit as a percentage of net sales was 32.5% in the second quarter of 2020 . . . , an increase of 167 basis points," noting that "[t]his gross profit rate increase was attributable to higher initial markups on inventory purchases . . . and a reduction in markdowns as a percentage of net sales."

193.    On a conference call with analysts and investors held the same day, Defendant Owen stated that "[a]s a result of our efforts to date, our store associates are able to better serve our customers during this period of heightened demand."

194.    Also during the conference call, Defendant Vasos stated: "Moving now to Fast Track, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on shelf availability," "[w]e continue to be pleased with the labor productivity investments we are seeing as a result of our efforts around rolltainer optimization and even more shelf-ready packaging."

195.    Also on August 27, 2020, Dollar General filed its quarterly report for the second quarter ended July 31, 2020 on Form 10-Q with the SEC (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and Garratt.

196.    The 2Q20 10-Q provided the same financial results reported in the second quarter 2020 press release and stated that "[g]ross profit, as a percentage of net sales, was 32.5% in the 2020 period . . . , an increase of 167 basis points, primarily reflecting higher initial inventory markups, a significant increase in sales of non-consumable products, and favorable markdowns." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2Q20 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

197.    On December 3, 2020, Dollar General issued a press release providing the Company's results for the third quarter ended October 30, 2020. The press release stated that net sales increased 17.3%, same-store sales increased 12.2%, while diluted EPS increased 62.7% to $2.31. The press release quoted Defendant Vasos as stating that "[o]verall, our ongoing operating priorities, coupled with our key strategic initiatives, position us well to continue delivering value and convenience for our customers, along with long-term sustainable growth and value for our shareholders." The press release emphasized that "[g]ross profit as a percentage of net sales was

31.3% in the third quarter of 2020 . . . , an increase of 178 basis points," noting that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales, higher initial markups on inventory purchases, a greater proportion of sales coming from the non-consumables product categories, which generally have a higher gross profit rate than the consumables product category, and a reduction in inventory shrink as a percentage of net sales."

198.   The same day, the Company hosted an earnings call with analysts and investors to discuss third quarter 2020 results. Defendant Owen highlighted purported customer satisfaction with Dollar General store operations, stating: "We continue to build on our success with Fast Track, which Todd will discuss in more detail later" and that "[a]s a result of our efforts to date, our store associates are able to better serve our customers during this period of heightened demand as evidenced by our recent customer survey results, where we continue to see overall satisfaction scores at all-time highs."

199.   On the same call, Defendant Vasos stated: "We continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts around rolltainer optimization and even more shelf-ready packaging."

200.   Also on December 3, 2020, Dollar General filed its quarterly report for the third quarter 2020 on Form 10-Q with the SEC (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and Garratt. The 3Q20 Form 10-Q provided the same financial results reported in the 3Q20 release and stated that "[g]ross profit, as a percentage of net sales, was 31.3% in the 2020 period . . . , an increase of 178 basis points, primarily reflecting favorable markdowns, higher initial inventory markups, and an increase in sales of products in our non-consumable categories." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 3Q20 Form 10-Q stated

that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

201. On March 18, 2021, the Company issued a release providing results for the fourth quarter and fiscal year ended January 29, 2021. The press release stated that net sales increased 17.6%, same-store sales increased 12.7%, and operating profit increased 21%, while diluted EPS increased 24.8% to $2.62. Defendant Vasos was quoted in the press release as stating: "[w]e continue to operate from a position of strength, and are excited about our plans for 2021 to continue delivering value and convenience for our customers, along with long-term sustainable growth and value for our shareholders."

202. The press release also emphasized that "[g]ross profit as a percentage of net sales was 32.5% in the fourth quarter of 2020 . . . , an increase of 77 basis points," noting that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales; higher initial markups on inventory purchases . . . and a reduction in inventory shrink as a percentage of net sales."

203. The same day, Dollar General hosted an earnings call with analysts and investors to discuss the Company's results from fourth quarter 2020 and full fiscal year 2020. During the call, Defendant Vasos represented that "[c]ollectively, our fourth quarter and full year results reflect strong and disciplined execution across many fronts and further validate our belief that we are pursuing the right strategies to enable sustainable growth while creating meaningful long-term shareholder value." Defendant Garratt added that "[w]hile a lot of stocks remain higher than we would like for certain high-demand products, we continue to make good progress with improving our in-stock position and are pleased with our overall inventory levels."

204.    On the same call, Defendant Owen further added that "[w]e continue to build on our success with electronic article surveillance by increasing the number of items tagged while further leveraging technology to drive even higher levels of in-store execution." Defendant Owen then praised the purported strength of the Company's store stocking procedures, stating that "[o]ur Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability," adding that "[w]e continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts around both rolltainer and case pack optimization, which have led to the more efficient stocking of our stores."

205.    In response to an analyst question about margin sustainability, Defendant Garratt highlighted the purported optimization of the Company's product pricing efforts, stating, in relevant part:

> Again, when you look at our scale and our growing scale as a limited SKU shop, it really puts us in a very favorable position to get best pricing there and protect our margins while also being well priced. And on the price front, we'll always reserve the right to invest as needed. But as we look at now and as we've seen for quite a while now, we feel like we're in the best position on pricing we've been in and don't see, at least the foreseeable future, the need to invest there. So we feel good about the long-term ability to continue to grow gross margin while also driving traffic and sales.

206.    On March 19, 2021, the Company filed its annual report for the full fiscal year 2020 on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Vasos, Garratt, Bryant, Calbert, Fili-Krushel, McGuire, Rhodes, Sandler, and Santana, and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and Garratt. The 2020 10-K provided the same financial results reported in the fiscal year 2020 press release, and stated that "[o]ur gross profit rate increased by 117 basis points due primarily to lower markdowns as a percentage of sales and higher initial markups on inventory purchases.

207.    With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2020 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances." The FY20 Form 10-K further stated that "[e]fficient inventory management is a key component of our business success and profitability," and that the Company "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage."

208.    On May 27, 2021, the Company issued a press release providing results from the first quarter ended April 30, 2021. The press release stated that while same-store sale decreased 4.6%, operating profit increased 4.9% while diluted EPS increased 10.2% to $2.82. Defendant Vasos was quoted in the press release as stating that "[g]iven our first-quarter outperformance, we are raising our financial outlook for fiscal 2021 ['FY21']," adding that "we are well-positioned to continue delivering long-term sustainable growth and value for our shareholders." The press release also emphasized that "[g]ross profit as a percentage of net sales was 32.8% in the first quarter of 2021 . . . , an increase of 208 basis points," noting that "[t]his gross profit rate increase was primarily attributable to higher initial markups on inventory purchases; a reduction in markdowns as a percentage of net sales; a greater proportion of sales coming from the non-consumables product categories . . . ; and a reduction in inventory shrink as a percentage of net sales."

209.    The same day, the Company hosted an earnings call with analysts and investors to discuss first quarter 2021 results. On that call, Defendant Garratt stated that Dollar General was "pleased with the overall quality of our inventory." With respect to the Company's purportedly

efficient store management practices, Defendant Garratt represented that such practices were sustainable and would drive long-term shareholder value, stating "we continue to be disciplined in how we manage expenses and capital with the goal of delivering consistent, strong financial performance while strategically investing for the long term," and adding that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value.

210.    Defendant Owen highlighted the increased efficiency, stating:

> Over the years, we have established a clear and defined process to control spending, which governs our disciplined approach to spending decisions. This zero-based budgeting approach, internally branded as Save to Serve, keeps the customer at the center of all we do while reinforcing our cost control mindset. Our Fast Track initiative is a great example of this approach where our goals include: increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. We continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts, both around rolltainer and case pack optimization, which have led to even more efficient stocking of our stores.

211.    Also on May 27, 2021, the Company filed its Quarterly Report for the first quarter 2021 on Form 10-Q with the SEC (the "1Q21 10-Q"). The 1Q21 10-Q provided the same financial results reported in the May 27, 2021 press release.

212.    The 1Q21 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 32.8% in the 2021 period . . . , primarily reflecting higher initial inventory markups, favorable markdowns, and an increase in sales of products in non-consumable categories." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 1Q21 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

213.   On August 26, 2021, the Company issued a press release providing results for the second quarter ended July 30, 2021. The press release stated that while same-store sales decreased 4.7%, Dollar General had achieved operating profit of $849.6 million, and diluted EPS of $2.69.

214.   The same day, the Company hosted an earnings call with analysts and investors to discuss second quarter 2021 results. Defendant Vasos stated that "[w]e believe we will ultimately exit the pandemic with a larger, broader and more engaged customer base than when we entered it, resulting in an even stronger foundation from which to grow." Defendant Vasos further added: "In short, I feel very good about the underlying strength of the business, and we're confident we are pursuing the right strategies to enable balanced and sustainable growth by creating meaningful long-term shareholder value."

215.   Defendant Garratt commented on the Company's current inventory levels, stating that Dollar General was "pleased with our strong inventory position for the back-to-school shopping season, and our teams continue to work closely with suppliers to ensure delivery of seasonal and other goods in the remaining back half of the year." Defendant Garratt further highlighted the purported sustainability of the Company's efficient business model, stating: "As always, we continue to be disciplined in how we manage expenses and capital, with the goal of delivering consistent, strong financial performance while strategically investing for the long term," and adding that "[w]e remain confident in our business model and ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."  Defendant Owen added:

> Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. The first phase of Fast Track consisted of optimizing our rolltainers and case pack sizes, resulting in the more efficient stocking of our stores.

216.    Also on August 26, 2021, the Company filed its Quarterly Report for the second quarter 2021 on Form 10-Q with the SEC (the "2Q21 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Vasos. The 2Q21 10-Q provided the same financial results reported in the August 26, 2021 press release.

217.    The 2Q21 10-Q further stated "[g]ross profit, as a percentage of net sales, was 31.6% in the 2021 period." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2Q21 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

218.    On December 2, 2021, the Company issued a press release providing results for the third quarter ended October 29, 2021. The press release stated that net sales increased 3.9%, while the Company had achieved operating profit of $665.6 million, and diluted EPS of $2.08. The press release also emphasized that "[g]ross profit as a percentage of net sales was 30.8% in the third quarter of 2021," noting that the Company had experienced "higher inventory markups and a reduction in inventory shrink as a percentage of net sales."

219.    The same day, the Company hosted an earnings call with analysts and investors to discuss third quarter 2021 results. Defendant Vasos stated that "[c]ollectively, our third quarter results reflect strong execution across many front and further validates our belief that we are pursuing the right strategies to enable sustainable growth, while supporting long-term shareholder value creation."

220.    Defendant Garratt added that "[a]s always, we continue to be disciplined in how we manage expenses and capital, with the goal of delivering consistent, strong financial performance, while strategically investing for the long term." He further added that "[w]e remain confident in

our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

221.    Defendant Owen highlighted the Company's purportedly efficient and effective store operations, stating:

> Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability.
>
> The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores

222.    Also on December 2, 2021, the Company filed its Quarterly Report for the third quarter 2021 on Form 10-Q with the SEC (the "3Q21 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Vasos. The 3Q21 10-Q provided the same financial results reported in the December 2, 2021 press release.

223.    The 3Q21 10-Q also stated that "[g]ross profit, as a percentage of net sales, was 30.8% in the 2021 period." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 3Q21 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

224.    On March 17, 2022, the Company issued a press release providing results for the fourth quarter and fiscal year ended January 28, 2022. The press release stated that although diluted EPS decreased 1.9% to $2.57, Dollar General's net sales increased 2.8% during the quarter. The press release quoted Defendant Vasos as stating that Dollar General's "teams remained focused on executing our operating priorities and advancing our strategic initiatives, which we believe position us well for solid sales and profit growth in 2022 and beyond." The press release also emphasized that "[g]ross profit as a percentage of net sales was 31.2% in the fourth quarter of

2021," noting that factors positively contributing to the result were "a reduction in markdowns as a percentage of net sales and higher inventory markups."

225. The same day, the Company hosted an earnings call with analysts and investors to discuss results fourth quarter 2021 and fiscal year 2021 results. Defendant Garratt highlighted the Company's inventory levels, stating that "we have begun to see a meaningful improvement in our in-stock levels since the end of the year and expect continued improvement as we move through 2022, underscoring our optimism that we are well positioned to serve our customers with the products they want and need."

226. Defendant Garratt highlighted the purported sustainability of the Company's operating model, stating that "[a]s always, we continue to be disciplined in how we manage expenses and capital with the goal of delivering consistent, strong financial performance while strategically investing in our business and employees for the long term," and adding that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value." Defendant Owen added:

> Notably, the Save to Serve program contributed more than $800 million in cumulative cost savings from its inception in 2015 through the end of 2021. Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability.
>
> The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.

227. The following day, on March 18, 2022, the Company filed its Annual Report for the fiscal year 2021 on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Vasos, Garratt, Bryant, Calbert, Fili-Krushel, McGuire, Rhodes, Sandler, and Santana, and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and

Garratt. The 2021 10-K provided the same financial results as reported a day earlier in the March 17, 2022 press release. With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2021 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances." The 2021 10-K further stated that "[e]fficient inventory management is a key component of our business success and profitability," and that the Company "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage."

228. On May 26, 2022, the Company issued a press release providing results for the first quarter ended April 29, 2022. The press release stated that although diluted EPS decreased 14.5% to $2.41, Dollar General's net sales increased 4.2% during the quarter. Defendant Vasos was quoted in the press release as stating "[w]e continue to drive strategic innovation as we further differentiate Dollar General in the discount retail channel, while delivering long-term sustainable growth and value for our shareholders." The press release further added that "[g]ross profit as a percentage of net sales was 31.3% in the first quarter of 2022," noting that "higher inventory markups" contributed to the gross profits.

229. The same day, the Company hosted an earnings call with analysts and investors to discuss first quarter 2022 results. Defendant Vasos emphasized that he was "pleased to report that [the Company] ha[d] continued to make improvements in [its] overall in-stock position, which [we] believe position [it] well to drive strong top line performance through the remainder of the year."

230.    With respect to lower inventory levels, Defendant Garratt emphasized that "[i]mportantly, we continue to believe the quality of our inventory is in good shape and that we are well positioned with the right mix and balance of products."

231.    Further, Defendant Owen highlighted the Company's store stocking functions, stating:

> Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.

232.    Also on May 26, 2022, the Company filed its Quarterly Report for the first quarter 2022 on Form 10-Q with the SEC (the "1Q22 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Vasos. The 3Q21 10-Q provided the same financial results reported in the May 26, 2022, press release.

233.    The 1Q22 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 31.3% in the 2022 period." With respect to the company's purported "effective[] manage[ment]" of its inventory, the 1Q22 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

234.    On August 25, 2022, the Company issued a press release providing results for the second quarter ended July 29, 2022. The press release reported that net sales increased 9%, same store sales increased 4.6%, and operating profit increased 7.5%, while diluted EPS increased 10.8% to $2.98. Further, the press release emphasized that "[g]ross profit as a percentage of net sales was 32.3% in the second quarter of 2022," noting that "[t]his gross profit rate increase was primarily attributable to higher inventory markups."

235.    In the press release, Defendant Vasos was quoted as stating: "Looking ahead, we are confident that our strategic actions, which have transformed this company in recent years and solidified Dollar General as the clear leader in small-box discount retail, have positioned us well for continued success, while supporting long-term shareholder value creation."

236.    The same day, the Company hosted an earnings call with analysts and investors to discuss second quarter 2022 results. On the call, Defendant Garratt represented that "importantly, we continue to believe the quality of our inventory is in good shape." With respect to fiscal year 2022 outlook, Defendant Garratt added: "we are confident in the business, and as Todd mentioned, we are increasing our sales outlook for 2022," noting that "[f]or the full year, we now expect the following: net sales growth of approximately 11%, including an estimated benefit of approximately 2 percentage points from the 53rd week," and "[a]dditionally, we are reiterating the remainder of our financial guidance for 2022, which includes EPS growth of approximately 12% to 14%."

237.    As to Dollar General's purported optimization of its store stocking operations, Defendant Owen stated:

> Our Fast Track initiative is a great example of this approach, where our current goals include increasing labor productivity in our stores and enhancing customer convenience. The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.

238.    Defendant Vasos represented that the Company's inventory "couldn't be better," adding:

> As it relates to the inventory levels, we couldn't be happier with where we sit today on inventory. We did all the right things early on, Michael, as you would imagine, coming from a Dollar General. We were well ahead of any inventory issues that may pop up unlike some of our competitors out there. We canceled orders as early as December because we saw where the customer was headed. We actually have canceled orders not only into Q2, but into the back half of the year. And all of our guidance is contemplated on that. So we feel very strong. The quality of our

inventory couldn't be better. And as we move forward, we believe that will benefit us as we move into the back half of this year and into next year.

239. Also on August 25, 2022, the Company filed its Quarterly Report for the second quarter 2022 on Form 10-Q with the SEC (the "2Q22 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Vasos, providing the same financial results reported in the August 25, 2022, press release.

240. The 2Q22 10-Q stated that "[g]ross profit, as a percentage of net sales, was 32.3% in the 2022 period . . . , an increase of 69 basis points, primarily reflecting higher inventory markups." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2Q22 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

241. On December 1, 2022, issued a press release providing results for the third quarter ended October 28, 2022. The press release reported that net sales increased 11.1%, same-store sales increased 6.8%, and operating profit increased 10.5%, while diluted EPS increased 12% to $2.33. In the press release, Defendant Owen was quoted as stating that Dollar General was "'pleased with [its] strong sales growth in the quarter, as well as a modest increase in customer traffic and continued share gains in both consumable and non-consumable product sales."

242. The press release also provided updated guidance for the fourth quarter and fiscal year 2022:

The Company now expects the following:

• Same-store sales growth of approximately 6% - 7% for the fourth quarter of fiscal year 2022, which would result in growth toward the upper end of its previously expected range of 4.0% - 4.5% for fiscal year 2022;

• Diluted EPS in the range of $3.15 - $3.30 for the fourth quarter of fiscal year 2022,

which would result in growth in the range of approximately 7% - 8% for fiscal year 2022; compared to its previous expectation in the range of approximately 12% - 14% for fiscal year 2022[.]

* * *

The Company continues to expect the following for fiscal year 2022:

• Net sales growth of approximately 11%, including an estimated benefit of approximately two percentage points from the 53rd week . . . .

243.    The same day, the Company hosted an earnings call with analysts and investors to discuss third quarter 2022 results. On the call, Defendant Garratt represented that the increase in inventory levels was primarily due to cost inflation, mix changes, and seasonal impacts, stating:

Merchandise inventories were $7.1 billion at the end of the third quarter, an increase of 34.8% overall and 28.4% on a per store basis. Similar to the first half of the year, this increase primarily reflects the impact of product cost inflation, a greater mix of higher-value products, particularly in the home and seasonal categories, primarily due to the continued rollout of our non-consumables' initiative, and the early receipt of seasonal goods.

244.    With respect to the Company's financial outlook for fiscal year 2022, Defendant Garratt stated:

On year-to-date sales performance and our expectations for the remainder of Q4, we are reiterating our fiscal 2022 full year expectations for net sales growth of approximately 11%, including an estimated benefit of approximately 2 percentage points from the 53rd week, and we are updating our expectation for same-store sales growth for Q4, which we expect same-store sales growth in the range of 6% to 7%, which would result in growth toward the upper end of our previous range of approximately 4% to 4.5%.

245.    Defendant Garratt also emphasized that "despite the near-term challenges, we are confident in the business and our outlook for the remainder of the year," adding that "we feel good about the sales momentum going into next year, coupled with moderating cost pressures."

246.    Also on the call, Defendant Owen emphasized that the Company's "third operating priority is to leverage and reinforce [its] position as a low-cost operator." Defendant Owen further

represented that Dollar General had "a clear and defined process to control spending, which continues to govern [its] disciplined approach to spending decisions," and stated that "[t]his approach, internally branded as Save to Serve, keeps the customer at the center of all we do, while reinforcing our cost control mindset."

247.    In response to an analysts question as to "just what inning do you see the drivers of inventory markup in today," Defendant Garratt stated that the Company was effectively managing its inventory and mitigating markdown risks:

> You asked about markdowns as well. I didn't want to miss that question. As you look at markdown risk, while up from the unusually low levels last year, markdowns are still well below pre-pandemic levels. If you look at the majority of the inventory growth, it's really driven by inflation.
>
> The team has done a good job anticipating the mix shift in consumer demand and has proactively been adjusting orders. And as a result, we feel very good about the quality of the inventory, ability to mitigate the markdown risk. As always, we've set aside, what we believe is an appropriate markdown level for the upcoming Christmas season. And of course, this is all reflected in our guidance.

248.    Defendant Garratt also downplayed the risk of significant inventory losses, claiming any adverse effects would be short-lived and were being effectively addressed:

> The other piece – we did see – we mentioned as we progressed through Q3 is a greater headwind from inventory shrink and damages. And that shrink can have a tail to that. Rest assured, the team knows how to deal with this and is taking actions to address it. But it does have a tail to it. And then while we are making good progress resolving our storage capacity constraints with the capacity online, we do believe, as we mentioned, that some of this will carry over into Q4, but be largely resolved by Q1.

249.    Also on December 1, 2022, the Company filed its Quarterly Report for the third quarter 2022 on Form 10-Q with the SEC (the "3Q22 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Owen, providing the same financial results reported in the December 1, 2022, press release.

250.     The 3Q22 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 30.5% in the 2022 period." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 3Q22 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

251.     The statements detailed above were materially false and misleading and omitted material adverse facts regarding the Company's business and operations. Specifically, the statements failed to disclose that: (i) the Company's stores were chronically understaffed and suffering from logistical and inventory management problems, resulting in outdated and unwanted inventory, mispriced goods, and lost and damaged items; (ii) large backlogs of unsellable merchandise had built up at the Company's stores, which had not been timely written down due to understaffing and the failure to manage its inventory; (iii) the Company's management's allotment of employee hours per store per week placed employees in virtually impossible situations where assigned tasks could not be completed within the allotted time; (iv) Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (v) as a result, the Company risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; and (vi) accordingly, Dollar General was at risk of failing to achieve guidance provided to investors, and was running more than one hundred million dollars behind the Company's annual net sales guidance.

## SHARE REPURCHASES

252.     While engaging in the foregoing misconduct, issuing the above-described false and misleading statements, and concealing the truth from the market (as discussed *supra*), the

Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing significant harm to the Company.

253. Indeed, in May 2022, the Company's Board approved a share repurchase program to purchase up to $40 million of the Company's common stock. Following this, the Individual Defendants caused the Company to repurchase its shares under this repurchase program, as follows:

| Date | Number of Shares Repurchased | Avg. Price per Share ($) | Total Cost to the Company ($)[2] | Total Overpayment ($)[3] |
|---|---|---|---|---|
| May 2020 | 160,871 | 190.84 | 30,700,621.64 | 17,182,631.51 |
| June 2020 | 3,022,802 | 188.84 | 570,825,929.68 | 316,819,877.62 |
| August 2020 | 302,726 | 201.11 | 60,881,225.86 | 35,443,160.08 |
| September 2020 | 3,403,392 | 202.81 | 690,241,931.52 | 404,254,901.76 |
| October 2020 | 702,526 | 214.65 | 150,797,205.90 | 91,763,946.12 |
| December 2020 | 2,527,911 | 210.44 | 531,973,590.84 | 319,553,229.51 |
| January 2021 | 1,725,845 | 213.17 | 367,898,378.65 | 222,875,623.30 |
| February 2021 | 1,521,671 | 197.15 | 299,997,437.65 | 172,131,423.52 |
| March 2021 | 1,691,829 | 197.90 | 334,812,959.10 | 192,648,568.23 |
| April 2021 | 1,745,127 | 209.46 | 365,534,301.42 | 218,891,279.61 |
| May 2021 | 122,212 | 204.56 | 24,999,686.72 | 14,730,212.36 |
| June 2021 | 2,408,180 | 209.18 | 503,743,092.40 | 301,383,727.00 |
| July 2021 | 779,258 | 219.50 | 171,047,131.00 | 105,566,081.26 |
| August 2021 | 135,963 | 224.73 | 30,554,964.99 | 19,129,994.10 |
| September 2021 | 1,496,651 | 219.96 | 329,203,353.96 | 203,439,770.43 |
| December 2021 | 1,742,979 | 225.05 | 392,257,423.95 | 245,794,898.58 |
| January 2022 | 414,427 | 235.26 | 97,498,096.02 | 62,673,795.21 |
| February 2022 | 860,794 | 200.30 | 172,417,038.20 | 100,084,518.38 |
| March 2022 | 1,574,751 | 220.54 | 347,295,585.54 | 214,969,259.01 |
| April 2022 | 956,816 | 220.13 | 210,623,906.08 | 130,222,657.60 |
| May 2022 | 89,014 | 224.68 | 19,999,665.52 | 12,519,819.10 |
| June 2022 | 1,137,221 | 230.96 | 262,652,562.16 | 167,091,881.53 |
| July 2022 | 267,700 | 246.43 | 65,969,311.00 | 43,474,480.00 |
| August 2022 | 463,653 | 238.06 | 110,377,233.18 | 71,416,471.59 |
| September 2022 | 1,791,700 | 243.39 | 436,081,863.00 | 285,525,312.00 |
| December 2022 | 3,200,346 | 245.64 | 786,132,991.44 | 517,207,917.06 |
| January 2023 | 1,301,273 | 245.93 | 320,022,068.89 | 210,676,098.70 |
| | | | | |
| **TOTAL** | **35,547,638** | **--** | **7,684,539,556** | **4,697,471,535** |

254. Accordingly, the Individual Defendants caused the Company to engage in harmful

share repurchases while simultaneously issuing false and misleading statements to the market,

---

[2] "Total Cost to the Company" refers to the amount the Company paid for its own common stock.

[3] "Total Overpayment" refers to the amount that the Company overpaid for its common stock and is calculated by working out what the Company should have paid for its stock had it not been artificially inflated (*i.e.*, $84.03, as it was when the truth was revealed in August 2024) and subtracting that amount from what the Company actually paid.

causing the Company's share price to be artificially inflated. Had the Company's share price not been artificially inflated then these repurchases would have cost the Company $2,987,068,021. However, as a direct and proximate result of the Individual Defendants' unlawful conduct, the Company was forced to pay $7,684,539,556 for those shares – an overpayment of **over $4.6 billion**.

## INSIDER TRADING

255.     Rather than providing the market with correct information, Defendants Garratt, Vasos, and Fili-Krushel (the "Insider Trading Defendants") used their knowledge of Dollar General's material, non-public information to sell over $319 million of their personal holdings while the Company's stock was artificially inflated. As officers and directors of Dollar General, the Insider Trading Defendants were privy to material, nonpublic information about the Company's defective inventory controls, understaffing, and labor law violations, among other things.

256.     While in possession of this material, non-public knowledge, Defendant Garratt sold 174,674 shares of his personally held Dollar General stock for proceeds of nearly $35 million. Garratt's sales were timed to maximize profit from Dollar General's then artificially inflated stock price.  In particular, nearly all of Defendant Garratt's sales, except for two sales that occurred shortly after his resignation from the Company on June 2, 2023, took place when the Company's stock price traded at or near record highs and before the truth was revealed. Defendant Garratt's sales are also suspicious given that they were his first sales in over three years. Further adding to the suspicious timing of his sales, Defendant Garratt's stock sales represented nearly 57% of his holdings.

257.     While in possession of this material, non-public knowledge, Defendant Fili-Krushel sold 6,165 shares of her personally held Dollar General stock for proceeds of over $1.3

million. Fili- Krushel's sales were timed to maximize profit from Dollar General's then artificially inflated stock price. In particular, all of Defendant Fili-Krushel's sales took place when the Company's stock price traded at or near record highs and before the truth was revealed. Defendant Fili-Krushel's sales are also suspicious given that they were her first sales in over three years. Further adding to the suspicious timing of her sales, Defendant Fili-Krushel's stock sales represented 20% of her holdings.

258. While in possession of this material, non-public knowledge, Defendant Vasos sold 1.3 million shares of his personally held Dollar General stock for proceeds of over $283 million. Defendant Vasos's sales were timed to maximize profit from Dollar General's then artificially inflated stock price. In particular, nearly all of Defendant Vasos's sales, except for one, took place when the Company's stock price traded at or near record highs and before the truth was revealed. Defendant Vasos's sales are also suspicious given that they were his first sales in over three years. Further adding to the suspicious timing of his sales, Defendant Vasos's stock sales represented nearly 80% of his holdings.

## DAMAGE TO THE COMPANY

### Securities Class Action

259. On November 27, 2023, a securities class action complaint was filed in the United States District Court for the Middle District of Tennessee against the Company the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Washtenaw County Employees' Retirement System v. Dollar General Corporation, et al.*, 3:23-cv-1250 (M.D. Tenn.) (the "Securities Class Action").

260. Although the court granted the defendants' motion to dismiss the Securities Class Action, the lead plaintiffs filed a motion to set aside the judgment and file an amended complaint which was granted by the court on July 14, 2025. Accordingly, as a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers through substantive litigation which will continue following the lead plaintiffs' newly filed amended complaint.

**Unjust Compensation**

261. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

262. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

263. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

264. As alleged above, while engaging in and/or permitting the misconduct as alleged above, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices. As a result, the Company overpaid for its common stock by over $4.6 billion, thus causing significant harm to the Company.

**Insider Trading**

265. As alleged above, the Insider Selling Defendants, while in possession of material, non-public information, collectively abused their positions as Company insiders, misappropriated the Company's valuable information, and reaped over $319 million in gross proceeds through their unlawful insider trading which the Company is entitled to disgorge

**Departure of Defendant Owen**

266. As alleged above, On October 12, 2023, the Company announced that Defendant Owen was being terminated less than a year after he was appointed as CEO. As noted above, when announcing Defendant Owen's termination, the Company's Chairman of the Board stated: "[t]he Board has determined that a change in leadership is necessary to restore stability and confidence in the Company moving forward."

267. Defendant Owen held a high-ranking executive role within Dollar General, and filling this role will have required the Company to expend significant amounts. As is commonly reported, the cost of replacing C-suite executives can be costly for a company.[4]   Thus, the

---

[4]     *See e.g.*, *The Quiet (and Expensive) Cost of Poor C-Suite Retention*, Stanton Chase (Aug. 2022), https://www.stantonchase.com/insights/white-papers/the-quiet-and-expensive-cost-of-poor-c-suite-retention-2; *CEO Selection: The Costs of Getting it Wrong*, Spencer Stuart (May 2016), https://www.spencerstuart.com/research-and-insight/ceo-selection---the-costs-of-getting-it-wrong; *How Much Does Replacing an Employee Cost?*, BOS (2019), https://www.bos.com/inspired/how-much-does-replacing-an-employee-cost/.

Company having to replace Defendant Owen as a result of the wrongful conduct will undoubtedly have cost the Company substantial amounts.[5]

**Additional Damage to the Company**

268. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

269. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

270. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

271. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

272. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless

---

[5] In addition to the costs incurred by the Company in terminating and replacing other Former Employees, as alleged elsewhere herein.

disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

273.    Dollar General's Code of Conduct begins with a letter from Defendant and CEO Vasos addressed to employees stating that all employees, officers and Board members are expected to apply and uphold "the values that make our Company great: honesty, fairness and respect." Vasos further added: "As CEO, I pledge to uphold both the letter and the spirit of our Code. As a fellow team member, I expect you to do the same."

274.    The Code of Conduct states that the Company "simply does not tolerate illegal or unethical conduct by anyone regardless of position," and, the event of misconduct, "Dollar General will take appropriate disciplinary action and may report the issue to the proper authorities."

275.    In a section titled "Ensuring Accuracy of Records and Public Disclosers," the Code of Conduct provides:

> Our Company's SEC filings and other public communications must contain full, fair, accurate, timely and understandable information, without fail. To fulfill this obligation, we must comply with generally accepted accounting principles and our internal controls policies and procedures. We also must ensure Dollar General's books and records are accurate, complete and truthful at all times. This means any business records we submit—such as expense reports, time records and contract documentation—must be timely, complete and honest, and we may never maintain "off the books" accounts or make false or misleading entries. If you become aware of a potential problem with our Company's accounting or public disclosures, raise your concern with our Chief Accounting Officer or CFO immediately.

276.    In a section titled, "Ensuring Fair Disclosure," the Code of Conduct states, in relevant part:

> Dollar General has given certain employees sole responsibility for communicating publicly on its behalf to securities market participants or with respect to material nonpublic information, and they are the only employees authorized to do so. If a third party, such as the media or an analyst, directly or indirectly asks you a question about Dollar General or its activities, products, financial results, plans or public

policy positions, do not answer. Refer that person to Investor Relations or Public Relations.

In addition, public presentations or statements about Dollar General are subject to the requirements of our Disclosure Policy and our Social Media Policy. Please be sure to review those policies and contact Investor Relations for questions about the Disclosure Policy or your supervisor or Human Resources partner for questions about the Social Media Policy.

277.    With respect to fair dealing, the Code of Conduct states:

Employees and directors should always deal fairly with Edgio's customers, suppliers, vendors, competitors, and employees. No one should take unfair advantage of another through manipulation, concealment, abuse of confidential information, falsification, misrepresentation of material facts or any other practice involving intentional unfair dealing. This provision does not alter existing legal relationships between Edgio and its employees, including any at-will employment arrangements.

278.    In a section titled, "Obeying Insider Trading Laws," the Code of Conduct provides,

in relevant part:

At times, we may have access to information about Dollar General or a business partner that is not available to the general public. When we hold such inside information, it is illegal to buy or sell that company's stock or other securities. "Inside" information is also known as material, nonpublic information. Information is "material" if a reasonable investor would consider it important when deciding to buy, sell or hold stock. Information is "nonpublic" until it has been disclosed to the public and securities markets have had adequate time to digest the information. If you have questions about whether information is material or nonpublic, or whether there has been an inadvertent disclosure of such information, contact the General Counsel promptly.

Insider trading violates not only our Code, but also U.S. securities laws. Anyone who engages in insider trading is subject to disciplinary action and potential criminal prosecution. To help reduce the risk of a violation, the Company has established trading windows and preclearance requirements that are applicable to certain employees. You have been or will be notified if you are subject to such requirements. Please consult our Insider Trading Policy for more information.

279.    Dollar General's Corporate Governance Guidelines provide that the "basic role of

the Board is to protect shareholder interests by understanding and overseeing our long-term,

central strategies; understanding the issues, forces and risks that define our business; overseeing management's performance; and promoting law-abiding and ethical behavior by our employees."

280.     With respect to the "Corporate Ethics and Controls," the Corporate Governance Guidelines provides that the Board "shall exercise reasonable oversight over the implementation and effectiveness of our compliance and ethics program and ensure that an internal audit function is maintained."

**Audit Committee Charter**

281.     In addition to these duties, under the Audit Committee Charter in effect during relevant times, the members of the Audit Committee owed specific additional duties to Dollar General. The Audit Committee, pursuant to its Charter, is responsible for:

> • Assist Board oversight of (1) the integrity of the Company's financial statements; (2) the Company's compliance with legal and regulatory requirements; (3) the independent auditor's qualifications and independence; (4) the performance of the Company's internal audit function and independent auditors; and (5) the Company's evaluation of the Company's enterprise risks; and

> • Prepare the report required by the Securities and Exchange Commission for inclusion in the annual proxy statement.

282.     In a section outlining the Audit Committee's responsibilities the Audit Committee Charter states that the Audit Committee shall include, among other things:

> []. Review and discuss with management and the independent auditors:

> • The Company's annual audited financial statements and quarterly unaudited financial statements. This review must be conducted at a meeting (whether in person, telephonic or otherwise) and must include a review of the Company's specific disclosures under MD&A. The Committee shall recommend to the Board whether the annual audited financial statements should be included in the Company's Form 10-K.

> * * *

> • Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or

application of accounting principles, and major issues as to the adequacy and effectiveness of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

• Analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of financial statements.

• The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

• Any other matters required to be communicated to the Committee by the independent auditors pursuant to applicable rules of the Public Company Accounting Oversight Board.

[]. Discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. This discussion may be general (*i.e.*, in terms of the types of information to be disclosed and the type of presentation to be made, paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information), and the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

[]. Review and discuss with management (a) the Company's policies governing the process by which risk assessment and risk management is undertaken; and (b) the Company's major financial and other risk exposures, including those relating to information systems, information security, data privacy, and business continuity, and the steps management has taken to monitor and control such exposures.

[]. Review disclosures made to the Committee by the CEO and CFO regarding any significant deficiencies or material weaknesses in the design or operation of the Company's internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and any fraud that involves management or other employees that have a significant role in the Company's internal control over financial reporting.

## DUTIES OF THE DIRECTOR DEFENDANTS

283.    As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

284.    The conduct of the Director Defendants complained of herein involves a knowing

and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

285. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

286. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

287. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

288.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations

as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

289.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

290.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Individual Defendants' violations of the law, and their breaches of fiduciary duties, waste of corporate assets, and other wrongful conduct as alleged herein.

291.     Plaintiff is a current stockholder of Dollar General and has owned Dollar General stock at all relevant times hereto.  Plaintiff understands his obligation to hold Dollar General stock throughout the pendency of this action and is prepared to do so.

292.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

293.     Following the alleged misconduct and damage, on August 15, 2025, Plaintiff made a demand on the Board to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants – to recover, for the benefit of the Company, the damage caused to it.  Attached hereto as **Exhibit A** is a true and correct copy of the Demand.

294. On August 28, 2025, counsel for the Company responded by email as follows: "The Company has received your litigation demand and it is under consideration by the Board of Directors. *We will provide an update in due course*." (Emphasis added).

295. The Board has been on notice of the wrongdoing alleged herein since at least Plaintiff's serving of a books and records demand pursuant to TN Code § 48-26-102 on June 19, 2025, if not from the beginning of the wrongdoing alleged herein. As a result of the wrongdoing alleged herein, the Company has suffered significant harms and continues to suffer significant harms from its defective internal controls and exposure to legal and business risk. However, to date, the Board has failed to take any action on behalf of the Company

296. Because the Individual Defendants plausibly knew about the wrongdoing alleged herein, the Board ignoring Plaintiff's Demand and failing to take any action to remedy the harms alleged herein constitutes a wrongful refusal of the Demand which will irreparably prejudice the Company and its claims because, among other things, the wrongs complained of in the Demand remain uncorrected and the Company will suffer additional ongoing damage as a result.

297. In addition, the Board's refusal could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy. As such, the Board's refusal cannot be reasonably interpreted as being in the best interests of the Company or the product of prudent business judgment.[6]

298. Accordingly, the Board's response here is an unreasonable and wrongful refusal of

---

[6] It is also plausible that the Board, aware that (i) other related actions asserting demand futility may be dismissed for failing to make a demand, and (ii) the statute of limitations period would soon expire, are ignoring Plaintiff's demand so they will not have to investigate and commence an action against themselves for the alleged wrongdoing. Such action would most certainly not be in the Company's best interests, nor would it constitute a good faith exercise of the Board's business judgment.

Plaintiff's Demand to initiate an action for the benefit of the Company. The Company has suffered damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiff has satisfied the demand requirements and may pursue this action to procure a judgment in Dollar General's favor and should be permitted to proceed with this derivative action.

## CLAIMS FOR RELIEF

## COUNT ONE

### (Against the Individual Defendants for Breach of Fiduciary Duties)

299.     Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

300.     The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

301.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry and good faith.

302.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its prospects and operations, as well as Capone's educational background. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

303.     In breach of their fiduciary duties owed to Dollar General, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (i) the Company's stores were

chronically understaffed and suffering from logistical and inventory management problems, resulting in outdated and unwanted inventory, mispriced goods, and lost and damaged items; (ii) large backlogs of unsellable merchandise had built up at the Company's stores, which had not been timely written down due to understaffing and the failure to manage its inventory; (iii) the Company's management's allotment of employee hours per store per week placed employees in virtually impossible situations where assigned tasks could not be completed within the allotted time; (iv) Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (v) as a result, the Company risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; and (vi) accordingly, Dollar General was at risk of failing to achieve guidance provided to investors, and was running more than one hundred million dollars behind the Company's annual net sales guidance. As a result of the foregoing, Dollar General's public statements were materially false and misleading at all relevant times.

304.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## **COUNT TWO**

### **(Against the Individual Defendants for Gross Mismanagement)**

305.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

306. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

307. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

308. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT THREE

### (Against the Individual Defendants for Waste of Corporate Assets)

309. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

310. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

311. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions; and (iv) repurchasing billions of dollars' worth of the Company's stock while the stock price was artificially inflated.

312. As a result of the waste of corporate assets, the Individual Defendants are liable to

the Company.

## COUNT FOUR

### (Against the Individual Defendants for Unjust Enrichment)

313.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

314.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

315.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

316.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT FIVE

### (Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act)

317.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

318.    The Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the

Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

319. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Dollar General, their control over, and/or receipt and/or modification of Dollar General's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Dollar General, participated in the fraudulent scheme alleged herein.

320. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

321. The Individual Defendants were each members of Dollar General's Board of Directors and senior management team during the aforesaid time period. Based on their roles at Dollar General, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

322. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false

and misleading or contained material omissions. Given the nature and extent of the problems at Dollar General, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

323. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

324. As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

325. As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company

## COUNT SIX

### (Against the Insider Trading Defendants for Insider Trading)

326. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

327.     By reason of their fiduciary roles as officers and directors of the Company, the Insider Trading Defendants specifically owed the Company the highest obligation of due care, good faith, and loyalty.

328.     As officers of the Company, the Insider Trading Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

329.     When the Insider Trading Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above, and sold Company stock on the basis of such information for collective gross proceeds in excess of $319 million.

330.     The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated for their own benefit when they sold holdings in Company stock.  The Insider Trading Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

331.     As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 10(b) of the Exchange Act;

C. Awarding, against all the Insider Trading Defendants and in favor of the Company, disgorgement of all unlawfully obtained proceeds from their insider trading;

D. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 29, 2025

/s/ Paul Kent Bramlett
Paul Kent Bramlett #7387
Robert Preston Bramlett #25895
**BRAMLETT LAW OFFICES**
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Tel: (615) 248-2828
Fax: (866) 816-4116
Email: pknashlaw@aol.com
Email: Robert@BramlettLawOffices.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston

111

260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***